## Western Kentucky Gas Co. v. Public Service Commission.

June 19, 1945.

282

Cary, Miller & Kirk for appellant.

Dennis B. Wooton, Harry H. Wilson, C. E. Nichols, Harry R. Booth, T. J. Sparks, Gordon Lisanby and J. W. Powell for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Reversing.

Appellant by petition in the circuit court sought review of a ruling on its application for increase of rates. Following the filing Hon. Fred M. Vinson, then Stabilization Director (now William H. Davis), intervened. The company's demurrer to that pleading was overruled, and the Commission denied the allegations of the company's petition without affirmative plea. Upon submission the court dismissed the petition.

Appellant, engaged in the distribution of gas in twenty-six towns in southwestern Kentucky, alleged that in accord with KRS 278.190 it had filed with the Commission a schedule of new rates and asked its adoption; that it had complied with sec. 961, 50 U. S. C. A. Appendix, providing for notice to the proper Federal

agency, but the agency did not act. In its application it had shown that the fair value of its property was $325,396; for the year 1941 its operating revenue was $4,262.91, resulting in a return of 1.3 per cent on its rate base, while the general rule in the industry was a return of 6.5 per cent, just and reasonable, considering other factors; that in no year during its history had it received a sum approaching a reasonable return, to which it was entitled under 278.030, KRS.

It was alleged that upon a hearing it had made a detailed statement of its business and financial affairs, substantiated by testimony. In the hearings briefs were filed only by the company and some of the towns which had intervened. Local counsel for OPA was notified of hearings, and furnished copy of the schedule of proposed rates; the same information was sent to counsel in Washington, D. C. Both were informed later of postponed hearing dates. On June 28, following a communication of June 15, noted below, the company insisted that the Commission act on its application. An order of July 16, 1943 recited that: "On June 15, 1943 the Commission, having considered the application in the light of the Congressional Acts and the President's executive order, notified all interested parties: 'It is the view of the Commission that under existing circumstances and the expressed policy of the Federal Government, this is not an appropriate time to inaugurate increase in rates.' "

It was further recited that upon receipt of this July 15 notice applicant requested, and was granted an informal conference, and "at this meeting Mr. Arnold Hirsch of the Office of Price Administration was present, though the O. P. A. had not availed itself of the right to intervene, except by correspondence." The Commission did not agree with the contention that it was not to consider alone the Stabilization Act or the "Hold the Line Order, since it was directed to regulatory bodies such as this. We do not consider it necessary under the Act and the Order to have formal O. P. A. intervention." The order then contains this statement, indicative of the Commission's interpretations: "In normal times the record made by applicant might entitle it to favorable consideration. That we do not now decide. However, these are not normal. A war emergency exists that affects the whole nation, and we do not believe, under existing

circumstances and the expressed policy of the Government an increase in utility rates should be allowed, unless and until it is shown to this Commission that service to the consumer would be impaired.''

Appellant filed petition for rehearing, discussing at length the effect of the act and order. Rehearing was denied, then followed the petition for review. The Government authorities first appeared in the circuit court, by pleading which set up provisions of the Control Act of 1942 (Public Laws 421 and 729, 79th Congress, 2d Session, 50 U. S. C. A. Appendix secs. 901 et seq., 961 et seq.) providing that prices, wages and salaries should be held as far as practicable at the level of September 15, 1942, ''with adjustments where necessary to aid in the prosecution of the war, or to correct gross inequalities.'' It plead the salutary purpose of the act and order in checking inflation, and said: ''The same national interest which has required the stabilization of commodity prices, wages and salaries requires a fortiori, the stabilization of rates of public utilities, although in deference to the authorities already functioning in that field, Congress has excepted the regulation of public utility rates and charges from the emergency jurisdiction of the Price Administrator, and has allowed same to remain with the established regulatory Commission.'' It was, and is contended that the Commission upon a fair appraisal of the facts determined that applicant should be denied an increase in rates unless and until it affirmatively showed that service would not be impaired, and therefore acted in its discretion in conformity with the program of stabilization. It may be remarked that the question as to whether a denial of an increase in rates would or would not impair service, is not a matter of concern to the intervenor, except that in undertaking to demonstrate that an increase would bring about inflation, the fact, if it were such, might be advanced as an argument that the line should be held until a change in circumstances would not have evil results.

In appellant's petition while it was said that 6.5 per cent would be a just return, in its prayer it asked that the Commission be directed to determine the case on its merits (admitting in argument that the Government intervenor might be heard) and to enter an order allowing a reasonable return, based on the record. An

amended petition plead want of due process, equal protection, and that a denial of a just rate would constitute confiscation in violation of Federal and State Constitutions.

In order to determine just how far the act and order apply, we may advert to these documents, and the history attending enactment of the original act and amendment of October 2, 1942. The purpose of the Control Act, 50 U. S. C. A. Appendix sec. 901, was declared by Congress to be in the interest of national defense, and necessary to the effective prosecution of the war; to stabilize prices; to prevent speculation, unwarranted and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulations and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to national emergency, etc. Following the section, supra, appear a number of executive orders providing for stabilization.

By the Stabilization Act 50 U. S. C. A. Appendix sec. 961, the President was empowered to issue general orders, stabilizing prices, wages and salaries, affecting the cost of living, and to adjust prices, wages and salaries, when necessary to aid in war aims, or to correct gross inequalities. The section then reads: ''Provided, That no common carrier or other public utility shall make any general increase in its rates * * * which were in effect on September 15, 1942, unless it first gives thirty days notice to the President, or such agency as he may designate, and consents to the timely intervention by such agency before the Federal, State, or municipal authority having jurisdiction to consider such increase.''

The Executive Order No. 9328, of date April 8, 1943, 50 U. S. C. A. Appendix sec 901 note, which was styled ''Stabilization of Wages, Prices and Salaries,'' by Section 4 provided: ''The attention of all agencies of the Federal Government, and of all State and municipal authorities, concerned with the rates of * * * public utilities, is directed to the stabilization program of which this order is a part so that rate increases will be disapproved and rate reductions effected, consistently with the Act of October 2, 1942, and other applicable federal, state or municipal law, in order to keep down the cost

of living and effectuate the purpose of the stabilization program.''

The effect was to direct attention to the purposes of the Acts, which did not undertake to regulate or control utility rates. This order, together with the acts, would not have the effect of prohibiting the Commission from taking cognizance of KRS 278.030, which provides that ''every utility may demand, collect and receive fair, just and reasonable rates for the services rendered,'' consistently with the order. In so far as Federal legislation is concerned the regulatory body could reasonably increase rates upon a proper showing, unless it be shown such would violate the purpose of the Act. The section, supra, permits timely intervention by the Administrator before the Commission, and such showing as ''he wishes to make'' before general increases in rates, and holds in abeyance the effect of any proposed increase over levels existing on the date fixed by the law. Henderson v. Washington, M. & A. Motor Lines, 77 U. S. App. D. C. 26, 132 F. 2d 729, certiorari denied 318 U. S. 779, 63 S. Ct. 854, 87 L. Ed. 1147. The right conferred on the Administrator does not include the power to compel regulatory bodies to make a complete investigation against its better judgment or upon lines contrary to governing statutes. Washington Gas Light Co. v. Byrnes, 78 U. S. App. D. C. 107, F. 2d 547, affirmed in Vinson v. Washington G. L. Co., 321 U. S. 489, 64 S. Ct. 731, 737, 88 L. Ed. 883. In a dissenting opinion Mr. Justice Douglas said: ''I agree that Congress did not transfer rate-making power from the commissions to the Director. I agree that Congress must have contemplated that some rate increases might take place or else it would have treated the whole problem quite differently. But I find not the slightest indication that the Director was to be denied a full hearing. And I do not see how a full hearing could be accorded unless he was given the opportunity to establish, if he could, that the case under consideration showed no real hardship, that wartime demands were not causing the company to suffer, that its financial integrity and its ability to render service remained unimpaired, that its property was not being confiscated, and it was not being treated unfairly as compared with other companies. * * * We are told that a full hearing would have disclosed that the company was in fact earning more than 6½%.''

Farmers' Gin Co. v. Hayes, D. C., 54 F. Supp. 47, held that the provision of the Emergency Act that no general increase in utility rates should be made without notice, did not have the effect of giving the administrator authority to regulate rates. The invitation to the governmental agency was for the purpose of granting opportunity to test the inflationary trend, and to show what the proposed increase might portend. Byrnes v. Flanagan, D. C., 48 F. Supp. 703, 705. The U. S. Supreme Court has in a recent case given its construction and conclusions as to the effect of the act and order, Vinson v. Washington Gas Light Co., supra. That case originated in the District Court of the District of Columbia to test the validity of an increase in gas rates under a sliding scale in effect under a former order of the Commission. A detailed recital of the prolonged litigation would unnecessarily lengthen this opinion; it may be observed that the court upheld an increase, in opposition to the contention of the Director. In Washington Gas Light Co. v. Byrnes, 78 U. S. App. D. C. 107, 137 F. 2d 547, 553, the court held that in consideration of the application for increase, the terms of the Acts should be observed, but that the power of the regulatory body to fix rates was not changed by the amendment to the Control Act, except that the designated agency was given the right to be heard before an increase could become effective. The court gave a close analysis of the acts and Executive Order, setting out the various contentions of the Director. One was that the Act gave the President the power to stabilize all prices, including utility rates, at the 1942 September level. This construction was found to be "strained" when all relevant provisions of the acts are considered. The court found it significant that although the President was given power to nullify the provision against the regulation of wages contained in the original act, the power as to regulation of utility rates was denied him. In its stead Congress enacted the notice proviso. "This proviso clearly recognized the power of the Public Utilities Commission * * * and other regulatory bodies to fix utility rates, and leaves this power undisturbed except that it imposes * * * the duty to give thirty days notice to the President's agency, and to consent to its timely intervention before any general increase in rate * * * can be made in a rate proceeding. A corollary of this duty * * *

is of course the duty of the regulatory body to accord the intervenor a fair hearing. * * * It will be perceived that this interpretation gives effect to the proviso in that it preserves the power of the regulatory body, while exposing it to the public appeal of a government official charged with the administration of an act of Congress designed to protect the welfare of the entire nation.''

This case went from the Circuit Court of Appeals to the Supreme Court. It was said by the Supreme Court that the intervenor sought vacation of the Commission's order, because it had not received a fair hearing; this contention was based upon the assumption that under the Acts petitioners were entitled to demand that the Commission enlarge the scope of the hearing and convert the inquiry into one to determine whether an increase was necessary to the company to prevent hardship. The Commission contended that at most it was to accord intervenor a fair hearing ''as to the effect of any order in its relation to inflation in the war emergency.'' The court characterized the controversy as one between two governmental agencies as to whether the powers of the one or the other preponderate under the circumstances.

The court analyzing the acts and order found, as had the appellate court, that while the original Act gave the Administrator power over prices of commodities, ''which are not generally regulated by public authority,'' it had expressly withheld ''jurisdiction over public utility rates.'' Also that the Stabilization Act (proviso) made no alteration save to provide for notice. The court was not clear as to whether the language of the proviso conferred a right of intervention, setting out reasons justified by a recital of what occurred during the journey of the Act through Congress. In its analysis the court held: ''Evidently Congress intended to grant the Administrator plenary control over commodity prices, since they generally were not the subject of local regulation, but in both the original Act and the amendment, * * * was careful 'to avoid paralyzing or extinguishing local institutions.' * * * They (petitioners) say that, notwithstanding the absence of any categorical enactment, the general purpose of the original Act and its supplement show that Congress intended to prohibit the state

and regulatory authorities from permitting any increase in utility rates which was not shown to be necessary to prevent actual hardship. We are asked then, not only to revise the views expressed in Davies Warehouse Co. v. Bowles (321 U. S. 144, 64 S. Ct. 474, 88 L. Ed. 635), as to the scope of the Acts, but to infer from a general expression of congressional policy, the limitation of existing powers conferred by law on regulatory commissions throughout the nation, both state and federal, and the endowment of a different federal agency with new and superior rights and powers. This we are unable to do.''

The court closed its opinion thus: ''On the subject respecting which the petitioners were especially competent to enlighten the Commission,—namely the inflationary effect of the rate increase of 2.28% for one year, amounting, on the average, to three cents per month per customer, in the light of wage increases and increased commodity prices and overall conditions in the national economy,—no evidence was tendered by petitioners, in response to repeated invitations by the Commission.''

In Interstate Commerce Commission v. Jersey City, 322 U. S. 503, 64 S. Ct. 1129, 1134, 88 L. Ed. 1420, an increase in electric railway rates was not disturbed. The controversy began back in 1937 when the company endeavored to secure an increase. The matter was threshed out before the Commission until it allowed applicant an increase in certain fare rates, and the Administrator intervened. The Commission held its ground; the matter was transferred to the courts, and finally reached the Supreme Court, chiefly on matters of procedure, and the effect of fact finding by the Commission. The Supreme Court again discussed the power and rights of the Governmental Agency. It was not there claimed that the Administrator had not been accorded a full hearing, but. that the hearing should have taken a wider range. The court found before it ''an important but not a new question of administrative law,'' which as far as procedure is concerned is not here involved. The other question was whether as said by the district court the Commission ''lightly brushed aside'' the economic stabilization phase of the case, and gave too little weight to Administrator's contention that the increase created an inflationary tendency. The argument was that the Commission was under a distinct duty to give effect to wartime and sta-

bilization conditions, with which argument the court agreed, and said: "But that does not answer the real question, which is what is the effect of the stabilization legislation?" We consider that the keynote in the matter before us, and if we find, agreeably to the Court's construction, that the "effect" is otherwise than as contended for by appellees, then there is no necessity for a discussion of the weight of governmental orders, executive or administrative, nor the finality of the order of the Commission.

Reverting to the Supreme Court's opinion: The court found it proper to inquire into the relative powers of two Federal agencies. "Congress was free to apportion their functions as it saw fit and to transfer any part of the normal responsibility of the Commission to the Price Administrator. * * * But Congress did no such thing. The legislative history of relevant provisions of the Act was reviewed in Davies Warehouse Co. v. Bowles, 321 U. S. 144, 64 S. Ct. 474 (88 L. Ed. 635). It was there pointed out that Congress rejected a proposal that such rates should not be increased without the consent of the President. On the other hand it was assured by executive representatives that rate advances already subject to scrutiny on behalf of the public, and to proof of reasonableness were not the source of the more substantial inflationary threats. Congress then adopted the provision we earlier quoted, (notice). In the light of such history this Court has been reluctant to construe the emergency legislation as giving the Administrator standing to make mandatory demands upon other tribunals or to strip them of their usual discretions."

It is not apparent here, nor do we intimate that the Administration undertook to usurp the functions of the Commission. In so far as the record shows he only "appeared." No doubt he called the attention of the Commission to the acts and the order, of which, as we gather from the record, it had knowledge.

The Supreme Court in the two latest cases, supra, construed the law, the only difference in its application (in one case) being that the court was dealing with a body which had the responsibility of maintaining an adequate system of transportation. Here (as in the other case) we are dealing with a rate-making body, which has

the authority to say whether the utility company shall be permitted to begin operations, KRS 278.020; to establish its service rates, justly and reasonably, KRS 278.030, and require at all times adequate service, 278.280. Speaking of the Commerce Commission (Jersey City case) the court applicably said: "It is without power to protect these essential transportation agencies from rising labor and material costs. It can decide only how such unavoidable costs shall be met. They can in whole or part be charged to increased fares, or they can be allowed to result in defaults and receiverships and reorganizations, or they may be offset by inadequate service or delayed maintenance. All these considerations must be weighed by the Commission with wartime transportation needs as well as avoiding inflationary tendencies as a public responsibility. The need for informed expert and unbiased judgment is apparent."

There is no contention here that the Administrator was denied a hearing. Both the local and chief offices were notified, and the former wrote to the Commission that it "was awaiting advice from the Washington office as to what extent, if any we will be requested to participate in such hearings." The failure to take active part might well create an inference that these offices did not consider that a reasonable increase would tend toward inflation. The office may have thought, as it was expressed in the Jersey City case, supra: "We did not nor do we now, suggest that this proposed increase in fare (52 cents per month per passenger) will in and of itself result in inflation." In this aspect of the case it becomes apparent that the Commission based its order on its construction, and the effect of the Acts and order. The applicant was and is entitled to a hearing on merits, and in the discretion of the Commission, an order either rejecting the application or the allowance of an increase to be reasonable and just, under the record made, subject, as we construe the cited cases, to such showing as the Director may make on the question about which it is competent to advise.

It is the contention of appellant, assuming the record justified it, that a refusal of a just and reasonable increase, would amount to either a denial of equal protection of the law, confiscation or an unjust discrimina-

tion, thus violative of constitutional inhibitions. We find respectable authorities holding such to be the law, as regards confiscations. West v. Chesapeake & P. Telegraph Co., 295 U. S. 662, 55 S. Ct. 894, 79 L. Ed. 1640, 1641; United Rys. Electric Co. v. West, 280 U. S. 234, 50 S. Ct. 123, 74 L. Ed. 390; Denver Union Stock Yards Co. v. United States, 304 U. S. 470, 58 S. Ct. 990, 82 L. Ed. 1469. We do not find these to be in conflict with cases cited by appellee (intervenor) nor the recent cases; Yakus v. United States, 321 U. S. 414, 64 S. Ct. 660, 88 L. Ed. 834 (commodities), or Bowles v. Willingham, 321 U. S. 503, 64 S. Ct. 641, 88 L. Ed. 892 (rent). Whether these cases apply or not, the statutes provide for the procedure adopted by appellant. KRS 278.410 allows relief by injunctive process, under the status here, on the ground that the determination of the Commission is conceived to be "unlawful or unreasonable."

In closing may we be permitted to say that we are fully aware of and appreciate the admonition of Congress that "of all the consequences of war, except human slaughter, inflation is the most destructive." Hecht Co. v. Bowles, 321 U. S. 321, 64 S. Ct. 587, 592, 88 L. Ed. 754, and perhaps as sensitive to what might be its results as any other body or person. This does not justify us in taking judicial knowledge (if we might) of the fact that an increase would tend to inflation, or to hold that the applicant is not entitled to a determination of the question as to whether it may have a reasonable rate for services rendered, giving due regard to such showing as may be made by the Director. The construction placed upon the acts and order, and their effect by the Supreme Court, lead us to conclude that the judgment of the court of first instance should be, and it is reversed, with direction to remand to the Commission for action consistent with this opinion.

Judgment reversed.