## DAVIES WAREHOUSE CO. *v.* BOWLES, PRICE ADMINISTRATOR.

No. 112.   Argued November 18, 1943.—Decided January 31, 1944.

*Mr. Reginald L. Vaughan* for petitioner.

*Mr. Nathaniel L. Nathanson,* with whom *Solicitor General Fahy* and *Mr. Paul A. Freund* were on the brief, for respondent.

*Messrs. John E. Benton* and *Frederick G. Hamley* filed a brief on behalf of the National Association of Railroad and Utilities Commissioners, as *amicus curiae,* urging reversal.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The petitioner, Davies Warehouse Company, is incorporated under the laws of California and conducts a public warehouse in Los Angeles.   Its business is declared to be that of a public utility both by the Constitution of

California [1] and its Public Utilities Act.[2] The Act subjects to regulation by the Railroad Commission all warehouses which serve the public generally for compensation. § 2½. New warehouses may be established only after obtaining certificates of public convenience and necessity, which the Commission may refuse or condition and may suspend or revoke at any time for cause. § 50½. Petitioner must grant nondiscriminatory and equal rates to everyone, and it may not alter any existing rate or charge without permission. §§ 19, 15. The Commission upon its own motion or upon complaint may determine "the just, reasonable and sufficient rates" and fix the same by order. § 32. Petitioner is required to make periodic reports and is subject to numerous restrictions and disabilities. §§ 29, 51, 52, 75, 76, et al.

Several public warehouses, including the one before us, made application to the Commission for general rate increases. The Commission gave a public hearing in Feb-

---

[1] "The Legislature shall pass laws for the regulation and limitation of the charges for services performed and commodities furnished by telegraph and gas corporations, and the charges by corporations or individuals for storage and wharfage, in which there is a public use . . ." California Constitution, Art. IV, § 33.

"Every private corporation, and every individual or association of individuals, owning, operating, managing, or controlling any commercial railroad, interurban railroad, street railroad, canal, pipe line, plant, or equipment, or any part of such railroad, canal, pipe line, plant or equipment within this State, for the transportation or conveyance of passengers, or express matter, or freight of any kind, including crude oil, or for the transmission of telephone or telegraph messages, or for the production, generation, transmission, delivery or furnishing of heat, light, water or power or for the furnishing of storage or wharfage facilities, either directly or indirectly, to or for the public, and every common carrier, is hereby declared to be a public utility subject to such control and regulation by the Railroad Commission as may be provided by the Legislature . . ." California Constitution, Art. XII, § 23.

[2] California Gen. Laws (Deering, 1937) Act 6386, § 2 (dd).

ruary 1942. From undisputed testimony it appeared that: notice of hearing had been sent to over 3,000 customers and no one appeared in opposition; rates had not been advanced since 1938; wages, however, had been advanced on four different occasions; materials and supplies and wages of clerical and supervisory employees had also increased; overall costs of operation had risen during the period 20–26 per cent. On May 12, 1942, the Commission authorized a general 15 per cent advance which, it said, "will permit applicants to increase their rates to reimburse them in part for their added labor expense." The permission was so conditioned, however, that the reasonableness of any particular rate could be attacked by any customer, either by way of reparation proceeding, for which the Act makes provision, or otherwise. The effective date of the new rates was set by the Commission as May 22, 1942.

In the meantime the United States Price Administrator, acting under the Emergency Price Control Act,[3] on April 28, 1942 issued a General Maximum Price Regulation. The effect of the federal regulation and later amendments would have been to prohibit petitioner after July 1, 1942 from charging the rate authorized by the California Railroad Commission.

This federal Act provides that "nothing in this Act shall be construed to authorize the regulation of . . . (2) rates charged by any common carrier or other public utility." [4]

---

[3] 56 Stat. 23, 50 U. S. C. (Supp. II, 1942) § 901 *et seq.*

[4] § 302 (c), 50 U. S. C. (Supp. II, 1942) § 942 (c), reads: "The term 'commodity' means commodities, articles, products, and materials (except materials furnished for publication by any press association or feature service, books, magazines, motion pictures, periodicals and newspapers, other than as waste or scrap), and it also includes services rendered otherwise than as an employee in connection with the processing, distribution, storage, installation, repair, or negotiation or purchases or sales of a commodity, or in connection with the operation of

Petitioner, asserting itself to be within this exemption, made timely protest to the Price Administrator, which was denied. It then filed a complaint with the United States Emergency Court of Appeals, on which the Act confers exclusive original jurisdiction to determine the validity of regulations,[5] asking it to set aside the General Maximum Price Regulations in so far as they purport to regulate its charges. The Emergency Court of Appeals dismissed the complaint. Importance of the construction of the Act to its administration led us to grant certiorari.

Congress, in omitting to define "public utility" as used in the Act, left to the Administrator and the courts a task of unexpected difficulty. Use of that term in a context of generality wears an appearance of precision which proves illusory when exact application becomes necessary. Relevant authorities and considerations are numerous and equivocal, and different plausible definitions result from a mere shift of emphasis. It may be contended that the exemption runs in favor of any business generally and traditionally regarded as a utility, irrespective of ac-

---

any service establishment for the servicing of a commodity: *Provided,* That nothing in this Act shall be construed to authorize the regulation of (1) compensation paid by an employer to any of his employees, or (2) rates charged by any common carrier or other public utility, or (3) rates charged by any person engaged in the business of selling or underwriting insurance, or (4) rates charged by any person engaged in the business of operating or publishing a newspaper, periodical, or magazine, or operating a radio-broadcasting station, a motion-picture or other theater enterprise, or outdoor advertising facilities, or (5) rates charged for any professional services."

[5] § 204 (d), 50 U. S. C. (Supp. II, 1942) § 924 (d), provides: ". . . The Emergency Court of Appeals, and the Supreme Court upon review of judgments and orders of the Emergency Court of Appeals, shall have exclusive jurisdiction to determine the validity of any regulation or order issued under section 2, of any price schedule effective in accordance with the provisions of section 206, and of any provision of any such regulation, order, or price schedule. . . ."

tual state regulation. Or it may be urged to include any enterprise actually regulated as are utilities, regardless of traditional classification. Or it may be said to extend only to those businesses where actual utility regulation exists along with general and traditional utility character.

The Emergency Court of Appeals weighed the conflicting factors in thorough opinions and divided as to result.[6] Judges Maris and Magruder gave little weight to the existence of actual regulation and held the phrase to comprehend enterprises of the general utility type, among which they thought this warehouse had no place. They held that the federal price regulation superseded that of the state, but said, "This is one of those unfortunate cases where doubts would remain whichever way the case was decided"—a reservation we share. Chief Judge Vinson declared that this public warehouse possesses the basic indicia of a public utility and in addition has its rates fixed by an agency of the state, and under these circumstances must be considered a public utility within the meaning of the Act. He thought the state regulation should prevail over that of the Federal Price Administrator.

In *Munn* v. *Illinois,* 94 U. S. 113 (1877), this Court recognized that the business of public warehousing is "affected with a public interest" and that its regulation by the state is appropriate and constitutionally permissible. Cf. *Budd* v. *New York,* 143 U. S. 517, 544. Twenty-one states regulate warehouses in some respects.[7] Three states include warehouses in their statutory definition of

---

[6] 137 F. 2d 201.

[7] Arizona Code (1939) § 52–901; Arkansas Acts 1935, Act 83; California Gen. Laws (Deering, 1937) Act 6386, § 2 *et seq.;* Idaho Code Ann. (1932) § 59–128; Illinois Rev. Stat. (Bar Assn. ed. 1943) c. 111⅔, § 10 *et seq.,* c. 114, § 189 *et seq.;* Indiana Stat. Ann. (Burns, 1933) § 54–105 *et seq.;* Kansas Gen. Stat. (1935) § 34–224 *et seq.;* Maine

public utilities,[8] and eight include limited types of warehouses.[9] Forty-seven states have adopted the Uniform Warehouse Receipts Act, which gives warehouse receipts legal standing somewhat similar to that of a common carrier's bill of lading.[10]

We cannot, therefore, assume that Congress was unaware that a general statutory reference to "public utilities" might well be taken at least in some states to comprehend public warehouses. But Congress did not see fit to employ that precision of definition which it has used when it desired to make sure that its classification of public utilities for federal purposes would depend upon the nature of their activities uninfluenced by any state policy.[11] Legislative history is ambiguous, and in no instance was attention directed to the particular problem presented here as to the scope of the term "public utility." But the phrase was used to measure inclusions as well as exemptions and it seems to have been employed in a practical rather than legalistic sense. An effort was made

---

Rev. Stat. (1930) c. 62, § 15 *et seq.;* Minnesota Stat. (1941) c. 233; Missouri Rev. Stat. Ann. (1941) § 14685.1 *et seq.;* Nebraska Comp. Stat. (Supp. 1941) c. 88, § 219 *et seq.;* Nevada Comp. Laws (1929) § 6106 *et seq.;* North Carolina Code Ann. (1939) § 5124, Laws 1941, c. 291; North Dakota Comp. Laws (Supp. 1925) § 4609, c. 2, *et seq.,* Laws 1931, c. 227; Oklahoma Stat. (Supp. 1943) tit. 81; Oregon Comp. Laws Ann. § 60–301 *et seq.;* South Dakota Code (1939) c. 60.03; Texas Stat. (Vernon, 1936) art. 6445; Utah Code Ann. (1943) § 76–2–1 *et seq.;* Washington Rev. Stat. Ann. (Remington) §§ 10344, 10392, (Supp. 1940) § 11569–1 *et seq.;* Wisconsin Stat. (1941) § 195.21.

[8] California, Indiana, South Dakota, *loc. cit. supra* note 7.

[9] Arizona, Idaho, Illinois, Maine, Nevada, North Dakota, Utah, Washington, *loc. cit. supra* note 7.

[10] 3 Uniform Laws Ann. (Supp. 1942) 6.

[11] E. g., Public Utility Holding Company Act of 1935, § 2 (a), 49 Stat. 804, 15 U. S. C. § 79b (a); Federal Power Act, § 201 (e), 49 Stat. 848, 16 U. S. C. § 824 (e).

in the Senate to insert a provision that public utility rates should not be increased without consent of the President.[12] That proposal was rejected, however, and a provision was substituted which required any public utility which asked for an increase in rates to notify the President and to assent to the appearance of such agent as the President may designate to appear in behalf of the consuming public before the appropriate railroad or public utility commission, be it a state, federal, or municipal commission.[13] It is difficult to believe that a different scope was intended to be given to the same words in different sections of the legislation. The use of the same generic term in these different contexts indicates that it had no narrower connotation and should receive no stricter interpretation in the exemption merely because used to define an exemption.

Legislative history is unequivocal in its showing that rates already subject to state regulation as public utility rates were not considered in need of further control. Mr. Leon Henderson, one of the authors of the bill and the first Price Administrator, gave as reasons for exempting utilities that they seemed to be under an adequate system of state regulation;[14] that this was an area not likely to give difficulty or to cause, so far as could then be seen, any inflationary trend; that utilities had problems peculiar to themselves and no further regulation seemed necessary;[15]

---

[12] Amendment proposed by Senator Norris to S. J. Res. 161. H. R. 7565, as amended by Senate, § 1, 77th Cong., 2d Sess.

[13] 56 Stat. 765, 50 U. S. C. (Supp. II, 1942), § 961.

[14] ". . . and public utilities were under what for the time being at least seemed to be an adequate system of State regulation, and therefore did not need to be brought into review." Hearings before House Committee on Banking and Currency on H. R. 5479, 77th Cong., 1st Sess., Pt. I, Revised, p. 444.

[15] "Now, as to the utilities. There is, as the members are aware, an adequate set of regulations as to the charges which utility companies can make. These, again, are based upon a long series of judicial

and that he had found the agencies in control of utility rates "just as earnest as we are about keeping those costs down." [16]

Under these circumstances the reasonable view appears to be that Congress by the term "public utilities" exempted those whose charges already were regulated as public utilities and hence were not probable sources of inflationary dangers. It may be and probably is the case that in its rate regulation the California Commission will take account of different factors and have different objectives than does the Federal Price Administrator. That might have appealed to Congress as a reason for not exempting utilities at all, but it hardly helps define the limits of the exemption, for that objection is as cogent against what admittedly is included as against that which is left in doubt.

We think Congress desired to depart from the traditional partitioning of functions between state and federal government only so far as required to erect emergency barriers against inflation. No question as to the power of Congress to reach and regulate this business, should it find it necessary to do so, has been raised here. But as matter of policy Congress may well have desired

---

determinations, of State regulations, and of State laws. It seemed to those drafting the bill that this was an area which was not likely to give difficulty or to cause, so far as they could see at that time, any inflationary trend. The bill is designed to control an emergency inflationary situation and has left them out, just as it has transportation rates. There are questions peculiar to utilities and none of them, so far as I see at the present time, would make necessary further regulation by means of a price-control bill." *Id.*, pp. 54–55.

[16] ". . . I have found that every one of the agencies charged with these particular items of cost are just as earnest as we are about keeping those costs down." *Id.*, p. 445; see the dissenting opinion of Chief Judge Vinson in the Emergency Court of Appeals, 137 F. 2d 201, 209.

to avoid conflict or occasions for conflict between federal agencies and state authority which are detrimental to good administration and to public acceptance of an emergency system of price control that might founder if friction with public authorities be added to the difficulties of bringing private self-interest under control.[17] Where Congress has not clearly indicated a purpose to precipitate conflict, we should be reluctant to do so by decision.[18] In view of assurances to Congress that the evil would proceed only in a minor degree, if at all, from public utilities already under state price control, we think Congress did not intend, and certainly has given no clear indication that it did intend, to supersede the power of a state regulatory commission, exercising comprehensive control over the prices of a business appropriately classified as a utility. Classification by California of the public warehouse business as a utility is not novel, surprising, or capricious. The regulation imposed is not merely nominal or superficial but appears to be penetrating and complete. Therefore, we would have little hesitation in holding that petitioner's public warehouse under the circumstances is a public utility within the exemption of the Price Control Act, but for certain practical objections to that interpretation, urged on behalf of the Administrator with an earnestness which deserves, in view of the difficulties and importance of his task, careful examination.

1. It is urged that if the status of an industry under state law is to be considered, the Administrator "would have to face the question whether the particular business concerned was sufficiently 'affected with a public interest' constitutionally to justify the type of legal obligation

---

[17] The National Association of Railroad and Utilities Commissioners has filed a brief *amicus curiae* in opposition to what they consider an invasion by the Price Administrator of their field of public regulation.

[18] *Terminal Railroad Assn.* v. *Brotherhood of Trainmen*, 318 U. S. 1.

which the state imposes." The argument, in short, is that the Administrator would have to decide whether the state regulation is constitutional before he should recognize it. We cannot give weight to this view of his functions, which we think it unduly magnifies. State statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially declared. Certainly no power to adjudicate constitutional issues is conferred on the Administrator. Collusion between a state and a favored industry to impose forms of local regulation as a shield against federal control might be conceivable and if such a sham occurred the Administrator could perhaps challenge its effectiveness to support an exemption. But it more nearly accords with experience to assume that an industry does not submit to price regulation until it has explored all possible constitutional objections and litigated hopeful ones. We think the Administrator will not be remiss in his duties if he assumes the constitutionality of state regulatory statutes, under both state and federal constitutions, in the absence of a contrary judicial determination.

2. It also is objected that if we consider the status of an industry under state law, the Price Administrator "would have to scrutinize and differentiate many kinds of franchises. Thus the Administrator, as incident to the task of price control, would be called upon to determine in any number of particular instances questions of state law which require the most painstaking examination of statutes and decisions." We are not prepared to deny that in some degree this will be true, for we do not hold that all warehouses, or even that all warehouses regulated in some aspects, come within the exemption. We think the Administrator will have to form judgments and that they will be judgments of some difficulty. Simplicity of administration is a merit that does not inhere in a federal system of government, as it is claimed to do in a unitary

one. A federal system makes a merit, instead, of the very local autonomy in which complexities are inherent. Nor would the interpretation advocated by the Administrator avoid the necessity of ascertaining and considering rights thought to be possessed under local laws and not likely to be yielded readily. One effect of the Administrator's interpretation would be to postpone study of local laws from consideration in connection with wise administration to the time of litigation, as in this case. Local institutions, customs, and policies will not be overridden without fighting for consideration. The existence and force and function of established institutions of local government are always in the consciousness of lawmakers and, while their weight may vary, they may never be completely overlooked in the task of interpretation. At a time when great measures of concentration of direction are concededly necessary, it may be thought more far-sighted to avoid paralyzing or extinguishing local institutions which do not seriously conflict with the central government's place. Congress has given no indication that it would draw all such state authority into the vortex of the war power. Nor should we rush the trend to centralization where Congress has not. It could never be more appropriate than now to heed the maxim reiterated recently by the Court that "the extension of federal control into these traditional local domains is a 'delicate exercise of legislative policy in achieving a wise accommodation between the needs of central control and the lively maintenance of local institutions.'" *Yonkers* v. *United States,* 320 U. S. 685, 690; *Palmer* v. *Massachusetts,* 308 U. S. 79, 84. At least in the absence of a congressional mandate to that effect, we cannot adopt a rule of construction, otherwise unjustified, to relieve federal administrators of what we may well believe is a substantial burden but one implied by the terms of the legislation

when viewed against the background of our form of government.

3. It also is contended than an interpretation must prevail as matter of principle which will give the exemption a general and uniform operation in all states irrespective of local law. It is, of course, true that uniform operation of a federal law is a desirable end and, other things being equal, we often have interpreted statutes to achieve it.[19] But in no case relied upon did we achieve uniformity at the cost of establishing overlapping authority over the same subject matter in the state and in the Federal Government. When we do at times adopt for application of federal laws within a state a rule different from that used by a state in administering its laws, the two rules may subsist without conflict, each reigning in its own realm. It is a much more serious thing to adopt a rule of construction, as we are asked to do here, which precludes the execution of state laws by state authority in a matter normally within state power. The great body of law in this country which controls acquisition, transmission, and transfer of property, and defines the rights of its owners in relation to the state or to private parties, is found in the statutes and decisions of the state. The custom of resorting to them to give meaning and content to federal statutes is too old and its use too diversified to permit us to say that considerations of nation-wide uniformity must prevail in a particular case over our judgment that it is out of harmony with other objectives more important to

---

[19] The Administrator cites *Chicago Board of Trade* v. *Johnson*, 264 U. S. 1; *Lyeth* v. *Hoey*, 305 U. S. 188; *Morgan* v. *Commissioner*, 309 U. S. 78; *Jerome* v. *United States*, 318 U. S. 101, 104. See also *Deitrick* v. *Greaney*, 309 U. S. 190; *D'Oench, Duhme & Co.* v. *Federal Deposit Ins. Corp.*, 315 U. S. 447, 470; *Sola Electric Co.* v. *Jefferson Electric Co.*, 317 U. S. 173, 176; *Clearfield Trust Co.* v. *United States*, 318 U. S. 363.

the legislative purpose.[20]   What content we should give to the exemption in the case of a conventional utility not subject to a state regulatory statute or subject only to partial regulation is, of course, not before us.

4. Lastly, it is contended that we should accept the Administrator's view in deference to administrative construction.   The administrative ruling in this case was no sooner made than challenged.   We cannot be certain how far it was determined by the considerations advanced, mistakenly as we think, in its defense in this case.   It has hardly seasoned or broadened into a settled administrative practice.   If Congress had deemed it necessary or even appropriate that the Administrator's order should in effect be final in construing the scope of the national price-fixing policy, it would not have been at a loss for words to say so.   We do not think it should overweigh the considerations we have set forth as to the proper construction of the statute.

We hold that the petitioner's business is that of a public utility within the exemption of the Act, and the judgment below is accordingly

*Reversed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK and MR. JUSTICE MURPHY concur, dissenting:

I think the present decision places an unwarranted burden on those who are waging the present war against in-

---

[20] See *Mangus* v. *Miller,* 317 U. S. 178, *Corn Exchange Bank* v. *Klauder,* 318 U. S. 434, *Myers* v. *Matley,* 318 U. S. 622 (bankruptcy); *Uterhart* v. *United States,* 240 U. S. 598, 603, *Crooks* v. *Harrelson,* 282 U. S. 55, *Blair* v. *Commissioner,* 300 U. S. 5, *Helvering* v. *Fuller,* 310 U. S. 69, 74, *Helvering* v. *Stuart,* 317 U. S. 154 (taxation); *McClaine* v. *Rankin,* 197 U. S. 154, *Rawlings* v. *Ray,* 312 U. S. 96 (statute of limitations); *Brown* v. *United States,* 263 U. S. 78 (condemnation); *New York, C. & St. L. R. Co.* v. *Frank,* 314 U. S. 360, 364-66 (railroad consolidation); *United States* v. *Oklahoma Gas & Electric Co.,* 318 U. S. 206; *Board of Commissioners* v. *United States,* 308 U. S. 343.

flation. The Act exempts from federal price control the "rates charged by any common carrier or other public utility." § 302 (c). The Administrator has accordingly granted exemptions to enterprises furnishing the public with gas, electricity, water, light, heat or power, and telephone and telegraph services. That group embraces those enterprises which together with common carriers were traditionally included in the category of a "public utility." It should not be expanded by interpretation to include the filigree variety with which we are now concerned.

The purpose of the Act is to provide an instrument for national control of the inflationary forces set loose by the war. The need for uniformity in the enforcement of the Act is acute—to avoid inequality in burden and sacrifice; to weigh the odds for success as heavily as possible on the side of the public interest. The other exemptions in the Act apply uniformly throughout the country—wages, insurance rates, theatre admissions, fees for professional services, and the like. If the "public utility" exemption is confined to the traditional classes of utilities, substantial uniformity will be obtained as they are almost universally subject to rate regulation in the States. But under the view taken by the Court warehouses will be exempt in some States but not in others. The same will be true of wharves and docks, slaughter houses, public markets, cotton gins and what not. And even in the same State there will be exemptions for some warehouses but not for others. This dependence of exemptions on the vagaries of state law would be quite understandable if the federal act were designed to mesh with state control—federal control being interposed to take up where state regulation was impossible or ineffective, as in various types of public utility regulation. Then there would be a great need in view of our federal system to preserve as much local autonomy as possible. The same would also be true where only a partial overriding of state controls was necessary to reach the

limited federal objective. But the war against inflation is a grim affair calling for quite different requirements. It cannot be waged along those traditional lines. The luxuries of peace-time arrangements do not always fit the exigencies of this war emergency. Nor do the state rate-regulations in question supplement the federal system. They override it. And standards which they prescribe are not the standards for price-fixing under the present Act. The conventional power to fix rates is governed by criteria quite different from those which control the Administrator's action. He is to fix those maximum prices which "will be generally fair and equitable and will effectuate the purposes of this Act." § 2 (a).

Every exception read into the Act creates another point of leakage, multiplies the task of enforcement, and creates a favored class of businesses. I would not read the Act with such a hostile eye. Where two interpretations are possible I would take the one which avoids those results. The choice between the "letter" and the "spirit" is an ancient one even in the law. See Radin, A Short Way With Statutes, 56 Harv. L. Rev. 388. In this case I think the wrong choice has been made.