P. J. RITTER CO., A CORPORATION, PROSECUTOR, v. THE MAYOR OF THE CITY OF BRIDGETON, THE CITY COUNCIL OF THE CITY OF BRIDGETON AND THE CITY OF BRIDGETON, RESPONDENTS.

Submitted May 7, 1946—Decided December 9, 1946.

Before Justices BODINE, PERSKIE and WACHENFELD.

For the prosecutor, *Stanger & Howell* (*Robert G. Howell*, of counsel).

For the respondents, *John A. Casarow* (*David L. Horuvitz*, of counsel).

The opinion of the court was delivered by

PERSKIE, J. This is a water rate case. Broadly stated, the question requiring decision on the facts of this case, and the law applicable thereto, is whether the resolution of August 1st, 1944, and the ordinance (No. 512) of July 3d, 1945, adopted by respondents, regulating the supply of water to its consumers, and fixing the rates are, as claimed by prosecutor, illegal.

Respondent the City of Bridgeton (hereafter referred to as City) owns and operates its own water plant. *Pamph. L.* 1907, *ch.* 99, § *xxxv* (*Comp. Stat.* 1709-1910, *p.* 1412), saved from repeal by *R. S.* 40:106–1; *R. S.* 40:62–47; *R. S.* 40:62–79. It has a population of about 16,000 inhabitants who are housed in about 4,000 homes. It has a large number of plants in which various substantial industries, such as canning of foods, &c., are conducted. Prosecutor is the owner and operator of such a plant.

The first regulatory measure for the supply of water to its consumers was adopted by the City (Ordinance No. 159) on January 12th, 1909. So far as is here pertinent, this ordinance provides both for a flat or unmetered rate and for metered rates. The former was, generally stated, based upon the number and type of outlets and faucets used irrespective

of the size and number of supply lines, or quantity of water consumed. The latter was based upon the water consumed as evidenced by meters at the following rates:

"First 30,000 gallons or less, per quarter 15 cents per 1,000 gallons.

For the next 40,000 gallons or less, per quarter 12 cents per 1,000 gallons.

For the next 50,000 gallons or less, per quarter 10 cents per 1,000 gallons.

For the next 70,000 gallons or less, per quarter 8 cents per 1,000 gallons.

For the next 100,000 gallons or less, per quarter 6 cents per 1,000 gallons.

For the next 200,000 gallons or less, per quarter 5 cents per 1,000 gallons.

For the next 500,000 gallons or less, per quarter 4 cents per 1,000 gallons."

Total 990,000 gallons.

Prosecutor calculates that the average cost of each 1,000 gallons for the total number of gallons (990,000) set forth in the foregoing schedule, was $.0514. The fact is that from the date of the passage of the first ordinance (No. 159) up and until the day of the passage of the resolution (August 1st, 1944) under review, the City billed consumers under the unmetered provisions of the ordinance. Upon that basis, prosecutor paid the City a little less than $400 a year for the large quantities of water which it consumed. More as to this later.

Prior to 1929, the City's source of supply came from surface waters. Either because of the unrestrained pollution of such waters, or its insufficiency to meet the needs, or both, the City was obliged to change its source of supply from surface to sub-surface waters. Accordingly, it finally acquired five artesian wells between 1909 and the end of 1941. The fifth well (Irving Avenue) was acquired upon conditions which were imposed by the State Water Policy Commission on the authority of *R. S.* 58:1–21. The conditions, accepted

by the City, were that the City, within one year from the date of its acceptance, would, first, install meters in the plants operated by four of the largest consumers of water, of which prosecutor was the largest, and second, that the City would prepare and submit a plan for the meterization of the water supplied to all the inhabitants of the City.

Although the fifth well was completed and put to use in 1942, the City took no action to satisfy the conditions imposed and assumed by it relating to the installation of meters. This inaction is charged to war conditions which the City claims precluded it from obtaining water meters. Pressure on the part of the Water Policy Commission, and the easing of priorities finally enabled the City in 1944 to purchase and install meters in the plants of five of the largest consumers of water of which, as already indicated, prosecutor was the largest one. These meters were finally installed on August 1st, 1944. On the same day, the City adopted a resolution which recites the installation of the meters in the five named plants, their locations and fixes the rate to be charged to the named industrial plant consumers, at $.055 for each 1,000 gallons.

This rate (5½ cents) continued until July 3d, 1945, when the City adopted ordinance No. 512, under review, amending sections 32 and 34 of ordinance No. 159. Section 34 was amended and reads as follows:

"Section 34. That the subject of meters of Section 34 of said Ordinance No. 159 be amended so that the same shall cease to read as heretofore, and shall hereafter read as follows:

### METERS

For the first 10,000 gallons or less per quarter, 25 cents per 1,000 gallons.

For the next 30,000 gallons or less per quarter, 20 cents per 1,000 gallons.

For the next 40,000 gallons or less per quarter, 18 cents per 1,000 gallons.

For the next 50,000 gallons or less per quarter, 15 cents per 1,000 gallons.

For the next 70,000 gallons or less per quarter, 12 cents per 1,000 gallons.

> For the next 100,000 gallons or less per quarter, 10 cents per 1,000 gallons.
>
> For the next 200,000 gallons or less per quarter, 8 cents per 1,000 gallons.
>
> For the next 500,000 gallons or less per quarter, 7 cents per 1,000 gallons.
>
> For all additional water per quarter, 5½ cents per 1,000 gallons.
>
> Special industrial meter rate which may be granted to large consumers by City Council:
>
> For the first 7½ million gallons or less per quarter, 5½ cents per 1,000 gallons.
>
> For the next 15 million gallons or less per quarter, 3-7/10 cents per 1,000 gallons.
>
> For all additional water per quarter, 2.1 cents per 1,000 gallons."

Taking the first 990,000 gallons under the above schedule as compared with the same number of gallons under ordinance No. 159, prosecutor calculates the average cost for each 1,000 gallons at $.0928.

For reasons hereinafter stated, prosecutor did not resort to legal action until November 20th, 1945, when it caused notice to be given to the City of an application on November 23d, 1945, to Mr. Justice Colie for a writ of *certiorari* to review the resolution (August 1st, 1944) and ordinance No. 512. Mr. Justice Colie allowed the writ on November 27th, 1945. The *allocatur*, in addition to the usual wording thereof, recites the following legend: "Leave is * * * given to both parties on three day notice * * * to take depositions on the question of laches, if any, and also on the question of the reasonableness of water rates fixed by the resolution and ordinance under review."

Two preliminary observations are advisable. First, the City takes the position here, as it did on the taking of the depositions, that the added legend in the *allocatur* limits the issue in this cause to questions of laches and the reasonableness of the rates. The position taken is not sound. By the writ, this court indicated its willingness that there be certified

to it the resolution and ordinance in issue, together with all matters concerning the same to the end that this court may cause to be done what of right and justice, and according to law, ought to be done. Prosecutor, pursuant to the regular practice, set down fourteen reasons in support of its claim that the resolution and ordinance certified to us are illegal. Notwithstanding the aforestated legend, we do not think it was either intended to limit the issues, as claimed by the City or does it so limit the issues. Each party was free to take such depositions as in its judgment each deemed relevant to the issue raised by the writ, and the reasons set down in support thereof, namely, the legality or illegality of the resolution and ordinance certified to us. Each party did just that.

Second, the respondent takes the further position that prosecutor was guilty of laches which should in the circumstances exhibited, result in a dismissal of the writ on the authority of such typical cases as *Wight* v. *New Jersey Racing Commission*, 128 *N. J. L.* 517; 26 *Atl. Rep.* (2*d*) 709; *Tax Investment Corp.* v. *Murphy*, 132 *N. J. L.* 432; 40 *Atl. Rep.* (2*d*) 550. The circumstances relied upon are—briefly stated—that over fifteen months elapsed from the date of the passage of the resolution on August 1st, 1944, and over four months elapsed from the time that the operation of the rates under the resolution had expired and was amended by the provisions of ordinance No. 512, before prosecutor invoked the aid of the court for a writ of *certiorari* in November of 1945; and that prosecutor at no time challenged either the bond issue of $136,000 effected by the City, or the expenditure of $129,452.21 out of said issue.

Prosecutor's proofs cast serious doubt as to whether the expenditure of $129,452.21 was made pursuant to the resolution or the ordinance under review. But be that as it may, the proofs, in our opinion, fully explain and excuse prosecutor's delay to challenge the action of the City. These proofs disclose that prior and subsequent to the passage of the resolution and ordinance in question prosecutor, and others similarly affected, frequently conferred with the city fathers to the end of reaching a mutually satisfactory rate to all concerned. These conferences continued down to Octo-

ber 23d, 1945. Notwithstanding the passage of the resolution, the City in fact billed and accepted payment on November 2d, 1944, for the last quarter of that year, on the outlet basis, under ordinance No. 159. And it was not until late in the afternoon of election day—November 6th, 1945—that prosecutor was advised by the president of the City Council that the Council did not care further to discuss the matter. Prosecutor thereafter invoked the aid of the court—as already indicated—with reasonable promptness. There is no merit to the claim of laches. See *Stroebel* v. *Jefferson Trucking and Rigging Co.*, 125 *N. J. L.* 484, 487; 15 *Atl. Rep.* (*2d*) 805.

Before we consider and determine the points raised and argued for prosecutor, it should be helpful if we re-emphasize the statutory mandates in this type of a case which is, in effect, an attack upon the authority and *quantum* of a water assessment made against prosecutor. These mandates are found in *R. S.* 54:4–58 (assessments of water rates are not to be set aside for irregularities or illegality); *R. S.* 54:4–59 (court to fix amount due); and *R. S.* 54:4–60 (court shall make a proper levy). The aforestated statutes and their predecessor statutes have for their genesis *Pamph. L.* 1881, *ch.* 157. In construing *Pamph. L.* 1881, *supra,* our courts early established that its purpose was to destroy root and branch the power to defeat a tax, assessment or water rate imposed or levied except upon a meritorious ground. *Conover* v. *Honce,* 46 *N. J. L.* 347, 348, 349. This construction has been consistently followed by our courts. *N. P. Varley Association* v. *McFeeley,* 118 *Id.* 463; 193 *Atl. Rep.* 787; *Becker* v. *Little Ferry,* 126 *N. J. L.* 338, 339; 19 *Atl. Rep.* (*2d*) 657; *Ridgewood Elks Holding Corp.* v. *Ridgewood.* 127 *N. J. L.* 295, 296; 22 *Atl. Rep.* (*2d*) 266.

We turn to the consideration and determination of the points argued by the prosecutor.

1. Are the resolution and the ordinance void because they were allegedly adopted in violation of federal provisions? Our answer is in the negative.

More specifically stated, prosecutor contends that the resolution and ordinance are fatally defective because the City

failed to comply with the applicable provisions of the Stabilization Act of 1942, as amended (50 *U. S. C. A. Appx.* 961, *ch.* 578; 568 *Stat.* 765), and further failed to comply with Procedural Regulation No. 11 promulgated by the Office of Price Administration (section 1300, 901) pursuant to its designated power as authorized by the Stabilization Act, *supra.* The municipality admits the non-compliance but denies the asserted resultant fatality.

The Emergency Price Control Act of 1942 (50 *U. S. C. A. Appx.,* § 901, *ch.* 26; 56 *Stat.* 23) was adopted on January 30th, 1942. It provides, among other things, that "nothing in this Act shall be construed to authorize the regulation of * * * rates charged by any common carrier or public utility."

The Stabilization Act, *supra,* adopted on October 2d, 1942, did not change the quoted provisions of the Emergency Price Control Act. It "* * * required merely that no utility should generally increase rates in effect September 15th, 1942, unless it first gave thirty days' notice to the President or his representative and consented to the timely intervention of that representative before the federal, state, or municipal authority having jurisdiction to consider the increase." *Vinson* v. *Washington Gas Light Co.,* 321 *U. S.* 489; 88 *L. Ed.* 889.

Procedural Regulation No. 11 reads, in part, as follows:

"Thirty (30) days before the effective date of a general increase in the rates of charges of any common carrier or other public utility there shall be filed with the Transportation and Public Utilities Division of the Office of Price Administration, Washington, D. C., two copies of notice of such proposed increase * * *. If authority for the establishment of any such increase is required by any regulatory agency, notice shall be given on or before the time such authority is sought * * *."

What did the Congress intend to accomplish by the aforestated Acts? The Supreme Court of the United States has supplied the answer. It has held that the Congress intended "to depart from the traditional partitioning of functions between state and federal government only so far as required

to erect emergency barriers against inflation." To attain that objective, the Congress did not intend "to supersede the power of state regulatory commissions (in our state it is the Board of Public Utility Commissioners) exercising comprehensive control over prices of a business appropriately classified as a utility." *Davies Warehouse Co.* v. *Bowles,* 321 *U. S.* 144; 88 *L. Ed.* 635, 641, 642. Tersely stated, the Congress was careful "to avoid paralyzing or extinguishing local institutions." *Vinson* v. *Washington Gas Light Co., supra* (at *p.* 498); 88 *L. Ed.* 890. *Cf. Davies Warehouse Co.* v. *Bowles, supra* (at *p.* 154); 88 *L. Ed.* 642; *Yonkers* v. *United States,* 320 *U. S.* 685; 88 *L. Ed.* 400.

Pursuant to the federal policy, the Office of Price Administration had notice of and occasion to consider the application of the Stabilization Act of 1942 and Procedural Regulation No. 11. It instituted proceedings for leave to intervene in the instant cause. It, however, concluded, "after due deliberation" to withdraw its application. That conclusion was rested upon the "basis of a staff decision," that a general "increase" was not "involved." Counsel for respondent was notified accordingly.

Following that written notification, counsel for the National Office of Price Administration personally appeared before Part II of this court and in the presence of counsel for the parties to this suit advised the court that "their agency considered that its jurisdiction did not attach in this issue and begged leave to withdraw its application for intervention. "In the absence of any objection, the application was granted, and a formal order was signed by presiding justice dismissing the notice of application for an order of intervention. Prosecutor did not seek a review of that order. Thus even if we assume without so deciding, that the determination of the Office of Price Administration may have been wrong (*Cf. Henderson* v. *Washington, Marlboro and Annapolis Motor Lines, Inc.,* 132 *Fed. Rep.* (2*d*) 729, *certiorari* refused, 318 *U. S.* 779; 87 *L. Ed.* 1147), respondent was not aggrieved by the decision or by the position taken by the Office of Price Administration. If prosecutor was, it did nothing about it. It may not now be heard to complain.

The failure to satisfy the quoted provision of the Stabilization Act of 1942 and that of Procedural Regulation No. 11, is not, in the circumstances, fatal. *R. S.* 54:4–58.

2. Nor is the resolution void, as asserted, because the power of the City to regulate water rates should have been exercised by ordinance and not by resolution. Conceding that an ordinance should have been employed, nevertheless, this court is without the power to set aside an assessment, as here, for any irregularity or defect in form, or illegality in assessing or levying the same. *R. S.* 54:4–58; *R. S.* 54:4–59; *R. S.* 54:4–60; *Conover* v. *Honce, supra; V. P. Varley Association* v. *McFeeley, supra; Becker* v. *Little Ferry, supra; Ridgewood Elks Holding Corp.* v. *Ridgewood, supra.*

3. Is the ordinance void for uncertainty? The language employed in the amendments of sections 32 and 34 is plain, simple and understandable. To urge, as it is urged, to the contrary because parts of sections 32 and 34 were amended without re-enacting each section in its entirety as amended, however desirable such practice might be, does not render the ordinance void for uncertainty. There are, however, two phases concerning the amendment of section 32 which are legally objectionable.

First: Section 32 reads: *"When deemed advisable by the City Council,* and upon application therefor, meters will be attached to the supply pipe or premises."* (Italics supplied.) The italicized part of the section is subject to the attack that it provides no norm or standard as to the circumstances which should determine when the Council should deem it advisable to attach meters to the supply line or premises of an applicant. *Cf. Lipkin* v. *Duffy,* 119 *N. J. L.* 366; 196 *Atl. Rep.* 334; *South Orange* v. *Heller,* 92 *N. J. Eq.* 505; 113 *Atl. Rep.* 697. It is elementary that it is only when the norm or standard for discretionary action, under an ordinance, is clearly set down, that such ordinance may be enforced generally and impartially. The enforcement of an ordinance should not be left to the will or unregulated discretion of the governing authority or of its municipal officers. 2 *McQuillin, Municipal Corporations* (2d ed.) 726, § 764. Action invoked under an ordinance should not be a matter

of grace but rather a matter of right. But the stated infirmity does not, however, invalidate the entire ordinance. For the italicized part of the section is clearly an independent provision and is separable from the section and the ordinance, and may, therefore, be exscinded without invalidating the remainder of the section and without invalidating the ordinance *in.toto*. *Cf. Pennsylvania Railroad Co.* v. *Jersey City,* 47 *N. J. L.* 286, 289; *Haynes* v. *Cape May,* 52 *Id.* 180; 19 *Atl. Rep.* 176; *Schwarz Bros. Co.* v. *Board of Health,* 84 *N. J. L.* 735, and cases collated at *pp.* 739, 740; 87 *Atl. Rep.* 463; *Blake* v. *Pleasantville,* 87 *N. J. L.* 426, 430; 95 *Atl. Rep.* 113; *affirmed,* 89 *N. J. L.* 358; 98 *Atl. Rep.* 1084; *R. S.* 54:4–58; *R. S.* 54:4–59; *R. S.* 54:4–60.

The second phase relates to sub-division three of section 32, which reads: *"As directed by the City Council, all meters shall be installed by the Water Department at its expense* * * *."* (Italics ours.) This italicized provision is, as urged for prosecutor, contrary to the provisions of *R. S.* 40:62–78 which fixes the liability of such installation upon "the owner of any house, tenement, building or lot," and makes the "price or rent so fixed and other costs and expenses, interest and penalties * * * a lien upon said house, tenement, building or lot until paid and satisfied." But here, too, the stated infirmity is set down in an independent provision of the ordinance and is also clearly separable from the remainder of the ordinance, and may, therefore, be prescinded from the ordinance without invalidating the ordinance *in toto.* The cases and statutes cited as to the lack of a norm or standard for attaching meters to the supply pipe or premises (section 32) are also applicable here.

4. Are the resolution and ordinance discriminatory?

While its position is not clear as to the resolution, we apprehend that prosecutor's claim of discrimination lies in the fact that the City fixed a flat rate of 5½ cents for all industrial plant consumers who were supplied with meters under the resolution while other industrial users, and other users, were billed at the rate prescribed under ordinance No. 159, *i. e.,* on an outlet basis. As to ordinance No. 512, the argument is that the rates therein provided discriminate,

without warrant, between persons in the same class billed on
an outlet basis and those billed on a meter basis, and further
discriminates between persons of the same class who are billed
solely on the meter basis.

The arguments are not sound. Of course action by the
City must be fair and impartial and not unjustly discrimina-
tory or preferential in its operation. The asserted breach
of this principle finds no support in the proofs. When the
City, as here, supplies water to its inhabitants, in its pro-
prietary capacity, it is to be expected that it should follow
modern business practices. And it is common knowledge
that buyer of large quantities of merchandise receives favor-
able consideration from the seller as to price. Such con-
sideration is exemplified in the resolution. It is exemplified
in ordinance No. 512. We perceive no legal wrong in such
classification.

Such a classification is not unjustly discriminatory. We
must be practical. Here is a city of 16,000 inhabitants who
are housed in 4,000 homes. The City finds that its source
of water supply is insufficient. It set out to remedy that
condition. The costs incurred required additional revenue.
A plan to place a meter for water consumed in each household
and commercial institution was apparently formulated. The
total cost for such meterization is estimated at about $300,000.
And we gather that the city fathers' plan contemplates the
expenditure of $30,000 a year for about ten years completely
to meterize its services. Thus the City began—as soon as it
could—to install meters, as directed by the State Water Policy
Commission, in five of the largest industrial plants. And
thereafter, on a basis of priority given to various substantial
consumers of water, installed about 125 more meters, and
also installed eight test meters in residential and apartment
houses for revenue analysis. With due allowance for the
failure to obtain the right size meter for the Cumberland
Hotel and the unusual difficulties to conduct business in
these days, we find no proof in support of the complaint of
discrimination. As a matter of fact, the president of the
prosecutor company disavowed any claim of discrimination
against his company as to rates prescribed by ordinance No.

512, and likewise denied any knowledge of discrimination against any other consumer in the City under ordinance No. 512.

If the arguments for the prosecutor are sound, the City is without power to install meters for all consumers and to regulate the rates for its services on the basis of quantity of water supplied until it accomplishes the change in its entirety. In the meantime, the City's right to a fair and reasonable return on its investment would be denied to it. At all events, neither the resolution nor the ordinance indicates upon its face, or by reason of its operation, that it is unjustly discriminatory or preferential. *Cf. American Grocery Co.* v. *Board of Commissioners of New Brunswick,* 124 *N. J. L.* 293, 297; 11 *Atl. Rep.* (*2d*) 599; *affirmed,* 126 *N. J..L.* 367; 19 *Atl. Rep.* (*2d*) 696. It merely permits the exercise of a preference based upon normal business practices.

5. Are the rates reasonable? The factors and the law applicable thereto which are comprehended in determining or fixing a fair and just rate, based upon the fair value of the property, used and useful, at the time it is being so used in the public service, are well established. *Cf. New Jersey Suburban Water Co.* v. *Board of Public Utility Commissioners,* 123 *N. J. L.* 303; 8 *Atl. Rep.* (*2d*) 350; *certiorari* denied, *sub nominee McGregor* v. *Board of Public Utility Commissioners,* 309 *U. S.* 663; 84 *L. Ed.* 1010; *Atlantic City Sewerage Co.* v. *Board of Public Utility Commissioners,* 128 *N. J. L.* 359; 26 *Atl. Rep.* (*2d*) 71; *affirmed,* 129 *N. J. L.* 401; 29 *Atl. Rep.* (*2d*) 850; *Willcox* v. *Consolidated Gas Co.,* 212 *U. S.* 19; 53 *L. Ed.* 382; *State of Missouri, ex rel. Southwestern Bell Telephone Co.* v. *Public Service Commission,* 262 *U. S.* 276; 67 *L. Ed.* 81; 31 *A. L. R.* 807, 819. With due regard to those factors and the applicable law, the City submitted its proofs, including some sixteen exhibits, which we are told, and it is not denied, were certified by municipal accountants, in support of the 5½ cent rate under the resolution of August 1st, 1944, and the rates under ordinance No. 512. It would serve no purpose to detail these proofs. It shall sufficient if we state, in epitomized form, the results of these proofs.

*As to the 5½ cent rate under the resolution of August 1st, 1944.* The rate of 5½ cents for each 1,000 gallons of water prevailed from August 1st, 1944, until June 30th, 1945. The net water fixed capital was $380,200.45. The net income on a basis of eleven months was $14,253.24, and on a twelve month basis was $15,548.98. (The reason for the figures for an eleven and twelve month basis is that at the time of the preparation of the exhibits the figures for an eleven month basis only were available.) The return on the fixed capital was 4.1%. If, however, the rates prevailing under ordinance No. 512 had prevailed at the time, the net income would have been $8,729.72 for the eleven months and $9,522.68 for the twelve months; and the return on the net fixed water capital would have been 2.5%. It should be observed that in calculating these rates, the City did not include any charge for the services rendered to the water department by heads of other departments, such as mayor, city solicitor, by the street department, and others.

*As to the rates under ordinance No. 512.* From the City's exhibits R-2 and R-15, covering the period of eleven years, 1935 to December 31st, 1945, we learn the gross operating revenues earned by the City for the stated period, the deductions, and the net corporate income of each of the years during that period. The return on the net water fixed capital at December 31st, 1943, December 31st, 1944, November 30th, 1945, and December 31st, 1945, are especially analyzed and disclose the following:

For the year ending December 31st, 1943, the average net fixed water capital was $380,085.26. The net corporate income was $3,385.50, and the net return was .09%.

For the year ending December 31st, 1944, the average net fixed water capital was $380,085.26. The net corporate income was $8,679.89 and the net return was 2.29%.

For the year ending December 31st, 1945, the average net fixed water capital was $446,203.45. The net corporate income was $16,309.78. The return was 3.7% and if the graduated scale for the entire year under the ordinance had been used it is estimated that the return would have been 3.1%. The City admits that it calculated the value of its

property, used and useful, at the time it was used in the service of the public on the basis of original costs giving, however, due regard to the honesty and prudence of its capital invested. *Cf. State of Missouri, ex rel. Southwestern Bell Telephone Co. v. Public Service Commission, supra;* see 31 *A. L. R.* (at *p.* 819). While it is true that "reproduction costs, like historic costs, and actual costs, is a relevant fact requiring consideration" it is not an "exclusive test," it is also true that the weight given to each of these factors "is to be determined in light of the facts of the particular case" under consideration. *New Jersey Suburban Water Co. v. Board of Public Utility Commissioners, supra* (at *p.* 313), and the federal cases there cited. We need hardly labor the point, in light of our present industrial and economic conditions, with the scarcity and marked increase in the costs of materials, equipment, supplies and labor, that the method employed in fixing the rates is, in the circumstances exhibited, free from challenge. Moreover, prosecutor does not appear seriously—if at all—to challenge the City's method of calculation.

How the stated results based upon the method employed by the City in fixing its rates compare with those in adjacent localities similarly situated (*Cf. New Jersey Suburban Water Co. v. Board of Public Utility Commissioners, supra* (at *p.* 316)) is best answered by the following schedule:

| *Municipality* | Distance from *Bridgeton* | *Rate* | | | | |
|---|---|---|---|---|---|---|
| Camden | 40 miles | 10 | cents a thousand gallons | | | |
| Salem | 16 " | 16.5 | " | " | " | " |
| Cape May | 50 " | 20 | " | " | " | " |
| Egg Harbor | 30 " | 10 | " | " | " | " |
| Woodbury | 30 " | 8 | " | " | " | " |
| Vineland | 13 " | 6-2/3 | " | " | " | " |
| Haddonfield | 40 " | 15 | " | " | " | " |
| Hammonton | 25 " | 10.6 | " | " | " | " |

The fact is that for about two decades or more prosecutor, the largest consumer, paid a little less, or a very little more,

than $400 a year for the water it consumed. For examples, for the year of 1943, it consumed about 220 million of gallons of water which was 23% of the water sold by the City and for which it was paid $390 or .06% of the total revenue derived by the City for the sale of its water during that year.

Prosecutor used about the same amount of water for 1944 and about 195,398,258 gallons for the year of 1945 and of course was billed for same in accordance with the prevailing rates, but which prosecutor has not paid.

Prosecutor seems not to challenge the factors employed by the City in its valuation of the property and in the fixing of the rates save that it challenged the revenue of $16,309.76 for the year of 1945 as established by the City. Prosecutor claims that the revenue should have been $145,250.11. It attempts to sustain that claim on the answer of one Alfred H. Funke, Jr., to a hypothetical question posed to him by counsel for the prosecutor. This witness, a graduate electrical engineer, admitted that he does not hold himself out as a rate expert. He admitted that his conclusion was based upon the non-existent but speculative fact, namely, what the revenue might be if and when the City shall have completed the meterization of all its consumers. Passing over the question as to the qualifications of the witness as a rate expert, we are clear that the assumption of the stated non-existent and highly speculative fact was extra the issue involved. It was upon this erroneous assumption that counsel for the prosecutor builds up fantastic percentages of return to the City which is limited—as indicated—to a fair and just return upon the value of its property, used and useful, at the time it was being so used in the public service which the City rendered. The city fathers indicated that if and when the return justified a change in the rate, they would amend the ordinance accordingly. That is their obligation.

In fine, we find as a fact that the rate under the resolution of August 1st, 1944, and the rates under ordinance No. 512 are fair and just. No other matter argued for prosecutor requires further discussion.

The writ is dismissed, without costs to either party.