## SOUTHERN GOODS CORPORATION v. BOWLES, Price Adm'r, OPA.
### No. 5505.

Circuit Court of Appeals, Fourth Circuit.

Dec. 23, 1946.

G. E. Miller, of Asheboro, N. C. (Waldo C. Cheek, of Asheboro, N. C., on the brief), for appellant.

Nathan Siegel, of Washington, D. C. (George Moncharsh, David London, and Albert M. Dreyer, all of Washington, D. C., and Edward N. Vaden, of Atlanta, Ga., on the brief), for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal in a suit instituted by the Administrator of the Office of Price Administration against the Southern Goods Corporation (hereafter referred to as Southern), a wholesale jobber of furniture, to recover damages on account of sales made in excess of ceiling prices and to enjoin further violation of O.P.A. regulations. The case was heard without a jury and judgment was rendered against defendant for the sum of $7,645.47, representing the excess above what the court found to be the ceiling price on sales made to former customers of the National Chair Manufacturing Company (hereafter. referred to as National) between August 17, 1943, when defendant was organized, and June 8, 1944, when it discontinued business as a wholesale furniture dealer. The ceiling was established on the basis of prices charged by National in March, 1942, and a finding that that company was the most closely competitive seller of the same class as Southern, within the meaning of section 1499.20 of the General Maximum Price Regulation. The correctness of this finding is challenged by the appeal. The Administrator asks that it be upheld as correct and also that the judgment be sustained on the additional ground that it is supported by the "Gottesman-Ailes Interpretation" of the regulation, which applies its provisions to a new jobber selling to a manufacturer's former customers.

National was organized in 1939 and the record shows that the greater part of its product was sold to wholesale jobbers and chain stores. Because of limited capital and the necessity of making a quick sale of its products, it did not limit its sales to these classes of customers, but sold also to retail dealers who came to its factory to make purchases, selling to them at the same prices charged the wholesale jobbers and chain stores. Sales to retailers, however, constituted a relatively small part of its business. Thus in 1942, out of total sales of $1,355,419, only $126,054 represented sales to these retailers. In 1943 the figures were $1,728,435 and $124,977 and in 1944 they were $1,809,712 and $49,489.

In 1943 Southern was organized to do business as a wholesale furniture jobber, primarily to sell the product of National to retail dealers in the Carolinas, but also to handle the product of other manufacturers. 77% of the stock of Southern was owned by stockholders of National, who were the officers of both corporations. Between August 1943, when it was organized, and June 8, 1944, when it ceased to operate as a wholesaler of furniture manufactured by National, Southern did business amounting to $311,000, practically all of which represented goods purchased from National at a cost of approximately $265,000, being the ceiling price that National was permitted to charge for them. Only about one-fifth of the total sales made by Southern were to former customers of National, and it is agreed that the amount collected by Southern on sales to them in excess of National's ceiling price was $7,645.47.

Although recovery was asked in the complaint for triple damages based on the entire amount collected by Southern in excess of the ceiling price of National, it was later stipulated that, if entitled to recover at all, the Administrator could recover only the excess collected from former customers of National, i.e. the $7,645.47, and not the excess on all sales, and not triple damages. The court gave judgment for this amount on the theory that Southern, not having been in business in March, 1942, must take as its ceiling price that of its most closely competitive seller and that National was the most closely competitive seller within the meaning of the applicable regulation, 1499.20, the pertinent portion of which is as follows:

"Except as otherwise provided in this regulation, the seller's maximum price for any commodity or service shall be:

"(a) In those cases in which the seller dealt in the same or similar commodities or services during March, 1942:

"The highest price charged by the seller during such month—(1) For the same commodity or service; or (2) If no charge was made for the same commodity or service, for the similar commodity or service most nearly like it; or

"(b) In those cases in which the seller did not deal in the same or similar commodities or services during March, 1942:

"The highest price charged during such month by the the most closely competitive seller of the same class—(1) For the same commodity or srevice; or (2) If no charge was made for the same commodity or service, for the similar commodity or service most nearly like it."

The phrase "the most closely competitive seller of the same class" is then defined in section 20(g) of the regulation as follows:

"Most Closely Competitive Seller of the Same Class. 'Seller of the same class' means a seller—(1) Performing the same function (for example, manufacturing, distributing, retailing, processing, storing, installing, or repairing), (2) of similar type (for example, department store, mail order house, chain store, specialty shop, cut-rate store), (3) dealing in the same type of commodities or services, and (4) selling to the same class of purchaser. A seller's 'most closely competitive seller of the same class' shall be a seller of the same class who (a) is selling the same or a similar commodity, and (b) is closely competitive in the sale of such commodities, and (c) is located nearest to the seller."

The learned judge below took the view that National must be taken as Southern's most closely competitive seller of the same class because, after the organization of Southern, National continued to make a few sales to retail dealers. It is perfectly clear, however, that Southern was not in competition with National in any fair meaning of that term; and we think it equally clear that National was not a competitive seller within the definition contained in the regulation quoted above. Even if it could be said that National was performing the same function in making sales to retail dealers, notwithstanding that such sales were merely incidental to its principal business of manufacturing, and an unimportant incident at that, it certainly could not be said that National and Southern were sellers of similar type. Southern was a wholesale jobber of furniture seeking the business of retail dealers; National was a manufacturer of furniture seeking the business of wholesalers and chain stores and not the business of retailers. Southern was admittedly organized by the owners of National to handle the latter type of business which National did not want. It was perfectly lawful for them to organize Southern for that purpose; and it is clear that the ceiling price which Southern was required to observe was the ceiling established by the nearest competitive wholesale jobber dealing in furniture of the same character. There is nothing to show that Southern did not observe this ceiling, and the evidence is to the effect that it did so. If Southern had been bound to observe the ceiling established by National, this would have applied to all of its sales, and not merely to sales to former customers of National; and the fact that counsel for the Administrator admit that it does not have application to all sales made by Southern is most significant.

And we do not think that the Administrator's case is helped by what is referred to as the "Gottesman-Ailes Interpretation." This interpretation does not, of course, like a regulation, have the effect of law. Being merely a letter of advice with regard to the administration of the act promulgated by assistant general counsel for the guidance of price attorneys operating under the office, it is not entitled to the weight that the courts accord to an administrative interpretation evidenced by settled administrative practice. See Davies Warehouse Co. v. Bowles, 321 U.S. 144, 156, 64 S.Ct. 474, 88 L.Ed. 635. It would be absurd to hold that the courts must subordinate their judgment as to the meaning of a statute or regulation to the mere unsupported opinion of associate counsel in an administrative department. Since, however, the interpretation in question received the sanction of the Administrator as an official interpretation, it is entitled to respectful consideration by us in interpreting the regulation (Skidmore v. Swift, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124; Bowles v. Seminole Rock & Sand Co. 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700); but under settled principles it cannot add to or take from the regulation. The portion of the interpretation relied on is as follows:

"Maximum prices to retailers for sales by jobbers who replace the manufacturer. A serious condition has arisen which results from the practice of manufacturers, who customarily sold directly to retailers, now selling to jobbers. It is frequently argued that OPA cannot prohibit the entrance of jobbers into the distribution of a commodity which manufacturers have customarily sold directly to retailers. It is very clear, however, that OPA is under no obligation to make room for jobbers by increasing prices at retail or by squeezing retailers' margins. Accordingly the GMPR provides (sec. 2(b) ) that new sellers must determine their maximum prices with reference to the maximum prices of competitive sellers of the same class and competitive sellers are defined in terms of function and class of purchaser to whom sales are made. The term 'function' as used in the definition (sec. 20(g) ) does not refer to what the seller does to the article but refers to the function performed by the seller at the point or moment of sale. In other words it refers to the actual part he plays in the distribution of the article. On this basis a new jobber who sells to a manufacturer's former customers on the same conditions of sale is a competitive seller of the manufacturer and must take the manufacturer's maximum prices as his own. As has been outlined above, if the manufacturer who sells to the jobber has properly determined his ceiling price, the jobber should have an operating margin."

This language was evidently intended to apply to cases where a manufacturer has substituted a jobber for dealing with his trade in such way as to evade his established price ceiling and is thus doing indirectly what he would not be permitted to do directly. It could not have been intended to prevent jobbers from entering business, or from determining their ceiling prices in the ordinary way in accordance with the regulation. If given such meaning it would be void as transcending and conflicting with the regulation.

Southern did only one-fifth of its business with former customers of National; and it is only as to these that the Gottesman-Ailes interpretation is said to apply. Such application, however, would lead to the absurd result that Southern would have two ceiling prices for the same articles, one the ceiling established for the manufacturer to be charged to his customers and the other the ceiling of the nearest competitive jobber to be charged to others. No such ridiculous situation could have been contemplated. Principles applied in "piercing the corporate veil" have no application here, since Southern was not a mere alias for National, but admittedly an independent corporation engaged in an independent business, four-fifths of whose customers had never been customers of National. The case must be decided by a determination of who constitutes "the most closely competitive seller"; and certainly the theory that Southern was a mere agency or the alter ego of National is not only not found by the court or supported by the evidence but is also entirely inconsistent with any theory of competition.

The judgment appealed from will be reversed and the cause will be remanded with direction to enter judgment for the defendant.

Reversed and remanded.