**UNITED STATES of America**

v.

**Milton M. UNGER.**

**Cr. No. 211-56.**

United States District Court
D. New Jersey.
March 13, 1958.

Chester A. Weidenburner, U. S. Atty., for District of N. J., Newark, N. J. Joseph M. Howard, Criminal Section, Tax Division, Dept. of Justice, Washington, D. C., for plaintiff.

Adrian M. Unger, Newark, N. J., John E. Toolan, Perth Amboy, N. J., Edgar J. Goodrich, Washington, D. C., Lipman Redman, Washington, D. C., for defendant

VAN DUSEN, District Judge.

This case is before the court on defendant's motion to dismiss an indictment[1] based on 26 U.S.C.A. § 3793(b) (1), charging that the defendant "did wilfully and knowingly aid and assist in, and counsel, procure, and advise the pre-

1. For the reasons stated at the end of this opinion, the disposition of this mo-

tion makes it unnecessary to consider the other pending pre-trial motions.

paration and presentation to the Collector of Internal Revenue \* \* \* of a false and fraudulent joint income tax return for the calendar year 1949 of Louis and Emily E. Kamm, the said Louis Kamm having died on or about the 3d of May 1950; that is to say, the defendant, an attorney at law representing the said Emily E. Kamm and the estate of Louis Kamm, undertook to prepare and procure the preparation of the said joint income tax return and he, then and there well knowing that, in the calendar year 1949, he had personally participated in the consummation of the sale of stock of Retail Realty, Inc., held in the name of the said Emily E. Kamm, receiving the proceeds of said sale in the sum of $143,258.82 on behalf of the said Emily E. Kamm on December 30, 1949, prepared and caused the said joint income tax return to be prepared without reporting therein the said sale and the long term taxable gain thereon in the sum of $71,629.47."

On August 17, 1949, a contract for the sale of Retail Realties was signed by David Cronheim, representing the seller, and Walter Kirschner, representing the buyer. The stated consideration was $321,398.57 and, at the time of signing, a down payment of $75,000 was made. On August 18, 1949, Emily Kamm received a check (No. 43766) from David Cronheim for $37,500 representing her half of the down payment.

Under the terms of the contract, Mr. Cronheim was to own, both beneficially and of record, all outstanding stock and to produce the certificates properly executed for transfer at the closing, which was to be held in the office of Milton M. Unger in Newark, N. J., on January 3, 1950. At the closing, the seller was to hold a corporate meeting for the purpose of electing new directors, to be designated by the buyer, and to enter such

meeting in the minute book of the corporation.

Pursuant to an option in the contract, the buyer, upon giving proper notice in December 1949, accelerated the date of closing to December 30, 1949, in the law offices of Polette, Diamond, Roosevelt, Freidin and Mackay, 598 Madison Avenue, New York City (Par. 14 of Cronheim Exhibit 11).

Under an agreement dated August 18, 1949 (B. P. Exhibit 45),[2] Helen B. Jacobus, Ruth Sampson, David Cronheim and Emily Kamm, as owners of all the outstanding stock of Retail Realties, endorsed their certificates of shares in blank and delivered them to Milton M. Unger with authority "to deliver the same to the purchaser \* \* \* and to receive payment of the monies due \* \* \* and upon receiving such monies, \* \* \* to pay one-half of the same to David Cronheim and the remaining one-half to Emily Kamm, free and discharged of all claims on our part."

Mr. Unger had a conference with Mr. Cronheim on December 23, 1949 (B. P. Exhibit 4, pp. 35 ff., and Tabs A and B to the affidavit of Milton M. Unger dated 2/24/58), at which time he was given instructions relating to the closing of the sale. Upon receiving the purchase price, he was to disburse $15,430 to David Cronheim Agency for insurance premiums, $12,100 to David Cronheim Agency as commission, $12,100 to Louis Kamm Co. as commission, $12,100 to Albert M. Greenfield Co.[3] as commission, and then to divide the balance in two equal shares and remit checks to Mr. Cronheim and Mrs. Kamm.

Also, on December 30, 1949 (the day of the closing), Mr. Unger was directed by Mr. Kamm during a telephone call from Florida, where he and his wife were staying, to deposit $70,000 from Mrs. Kamm's share of the proceeds in

---

2. Exhibits of the Bills of Particulars are hereinafter referred to as "B. P. Exhibit."

3. Pursuant to subsequent arrangements, the $12,100 payable to Albert M. Greenfield & Co. was paid by a separate check delivered at the settlement to his representative, so that this sum did not have to be deducted from the $246,398.57 check mentioned below.

her "special" account with the Franklin Washington Trust Co., with the balance to be deposited in her checking account. Other instructions as to payment of insurance and commission fees confirmed the instructions given by Cronheim.

The closing was completed on December 30, 1949 (a Friday and the last banking day of the year) between 2 p. m. and 3 p. m. at the aforementioned 598 Madison Avenue, New York City. Mr. Unger at that time received a check, certified at the request of the buyer-drawer, drawn on the National Safety Bank and Trust Co., Broadway and 38th Street, New York City, in the amount of $246,-398.57. The practice of the drawee bank, normally, would be to pay such a check in cash upon proper and sufficient identification of the payee, provided it was satisfied as to the genuineness of the instrument and the endorsement thereon, and after having checked with the drawer thereof (see affidavit of Maxim Buchwalter dated 1/29/58).

Returning immediately to Newark, Mr. Unger gained admittance to the Franklin Washington Trust Co. after closing hours and thereupon deposited the certified check in his trustee account (see Exhibit attached to affidavit of Stanley J. Marek filed 2/25/58) and the proper entries were made in Mr. Unger's trustee ledger (see 25(5) of Government's Answer to Bill of Particulars). The deposit slip used by the defendant bore this wording:

"In receiving items for deposit or collection, this Bank acts only as depositor's collecting agent and as-

sumes no responsibility beyond the exercise of due care; * * * all items are credited subject to final payment in cash or solvent credits."[4]

In accordance with local banking custom, the certified check was sent to the Federal Reserve Bank of New York for collection and the endorsements indicate that the check cleared the Federal Reserve Bank of New York on January 3, 1950, at which time the Franklin Trust Co. was credited with the amount thereof. Thereafter, the funds were available for distribution (see Affidavit of Stanley J. Marek dated 1/7/58).

On December 31, 1949, defendant prepared two checks on his trustee account in the amounts of $70,000 and $32,443.09 payable to Mrs. Kamm, which were deposited in two separate bank accounts in her name by his secretary on January 3, 1950, that being the first business day following the closing (see B. P. Exhibit 4, p. 37, and p. 4 of Affidavit of Stanley J. Marek dated 1/7/58).

The fact that the agent, receiving a check to his own order, was acting for two independent principals under a contract authorizing him to receive payment, pay expenses, and divide the net proceeds in equal shares between the principals and the size of the check involved in this case (over a quarter of a million dollars) make this comment of Mr. Justice Pitney in Southern Pacific Co. v. Lowe, 1918, 247 U.S. 330, 338, 38 S.Ct. 540, 543, 62 L.Ed. 1142, particularly pertinent: "The case turns upon its very peculiar facts * * *."[5]

---

4. The deposit slip further exculpates the bank for default or negligence by its correspondents and losses in transit. It reserved the right to charge back any item at any time before final payment and also to charge back, at any time prior to midnight on the next business day following the day of receipt, any item found to be drawn against insufficient funds or otherwise not good and payable.

The New Jersey Bank Collection Code (N.J.S.A. 17:9A–230 to 246) contained this language in December 1949 (17 N.J.S.A. 9A–235B):

" * * * an item received by a bank * * * on a business day after its regular business hours * * * shall be deemed to have been received at the opening of its next business day * * *." which was January 3, 1950.

5. It is clear that if the check had been payable to Mrs. Kamm only, or to the agent as attorney for Mrs. Kamm only, it would have been taxable in 1949 (provided it was paid on presentment, as it was), even if it had been received after banking hours on the last business day of the year. Also, if either joint owner

■ ■ The Government correctly states that receipt of a certified check by the agent is receipt by the principal under the law of agency.[6] However, the United States Supreme Court has made clear that in dealing with questions concerning time of receipt of income under the Federal Income Tax Law, the practical effect of the alleged receipt of income will govern [7] and the legal fictions of agency law will not necessarily be strictly followed.[8]

In construing § 42(a) of the 1939 Internal Revenue Code, which provides that "The amount of all items of gross income shall be included in the gross income of the taxable year in which received by the taxpayer * * *", the United States Supreme Court has said that gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. [Citing cases.] That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, * * *." See Rutkin v. United States, 1952, 343 U.S. 130, 137, 72 S.Ct. 571, 575, 96 L.Ed. 833, rehearing denied, 1952, 343 U.S. 952, 72 S.Ct. 1039, 96 L.Ed. 1353. Section 29.42–2 of Treasury Regulations 111 provided in 1949:

"Sec. 29.42–2. Income not reduced to possession.—Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer

had been under the control of the other, the receipt of the check by their joint agent would be receipt by them (see footnotes 6 and 12 below).

6. See, for example, Doyle v. Loft, Inc., 1923, 98 N.J.L. 516, 120 A. 2. Even if the check was conditional payment, the condition was fulfilled by the eventual payment of the check. See Restatement of Agency, § 72, comment b (cf. current revision of this comment now being published), § 178 (see subdivision 1 of this section as contained in Tentative Draft No. 4 of Restatement of the Law, Second, Agency, dated 4/19/56), §§ 426 and 427; Condenser Service and Engineering Co., Inc. v. Mycalex Corporation of America, 1950, 7 N.J.Super. 427, 71 A.2d 404.

7. In Corliss v. Bowers, 1930, 281 U.S. 376, 378, 50 S.Ct. 336, 337, 74 L.Ed. 916, the court said:
"The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as his income, whether he sees fit to enjoy it or not."
In Tyler v. United States, 1930, 281 U.S. 497, 503, 50 S.Ct. 356, 359, 74 L.Ed. 991, the court said: "The power of taxation is * * * not to be restricted by legal fiction * * *. Taxation, as it many times has been said, is eminently practical * * *." In DuPont v. Commissioner, 3 Cir., 1933, 63 F.2d 44, 47, affirmed 1933, 289 U.S. 685, 53 S.Ct. 766, 77 L.Ed. 1447, the court said:

"Congress intended to establish a complete scheme for taxing income which must be carried out with due regard to substantial and practical results and must not be restricted by mere legal fiction."
Cf. Lucas v. Earl, 1930, 281 U.S. 111, 114–115, 50 S.Ct. 241, 74 L.Ed. 731; Bazley v. Commissioner, 1947, 331 U.S. 737, 740, 67 S.Ct. 1489, 91 L.Ed. 1782; Commissioner v. Culbertson, 1949, 337 U.S. 733, 745–746, 69 S.Ct. 1210, 1216, 93 L.Ed. 1659, where the court considered whether there was a "substantial change in the economic relation" of the taxpayer to the alleged income. This principle has been applied to benefit the taxpayer as well as the Government. See, for example, Sneed v. Jones, D.C. W.D.Okl.1952, 103 F.Supp. 802, 805, and cases there cited.

8. In Lucas v. American Code Co., 1930, 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538, Mr. Justice Brandeis said that the general test of the tax period when losses (and receipts) are to be taken into account "calls for a practical, not a legal, test." In Maryland Casualty Co. v. United States, 1920, 251 U.S. 342, 347, 40 S.Ct. 155, 64 L.Ed. 297, relied on by the Government, the court thought it wise to emphasize that receipt by the agent was receipt by the principal because the agent had the duty to honor drafts drawn upon it by the principal in favor of others.

854

without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition."

Although the Government contends that this language and the doctrine of constructive receipt are inapplicable here because possession by the agent was possession by the principal,[9] this language of the Treasury Department is pertinent in view of the facts of this case, including the following:

A. The record makes clear that the check for $246,398.57 was received by the agent as joint agent for two principals[10] with the understanding that $39,630 should be paid as commissions from it and the balance divided between them. Under these circumstances, accepting the Government's position that receipt by the agent is receipt by the principal, the check to Mr. Unger's order was equivalent to a joint check made out to Mr. Cronheim and Mrs. Kamm, who was in Florida, and the joint payees had agreed that $39,630 of the joint check was to be distributed for insurance and real estate commissions, making it essential that the check be cashed or deposited.

B. The affidavit filed by the Government as to the practice of the bank on which the check was drawn shows that at least three conditions[11] would have had to be fulfilled before a check of this size would be cashed by it, including the condition that the bank would check "with the maker thereof." The drawee bank was located at Broadway and 38th Street (about 25 blocks, being 2½ miles, from the place of settlement at 598 Madison Avenue).

The portion of this check allocable to Mrs. Kamm was not "made available to her so that it may be drawn at any time and its receipt brought within (her) own control and disposition"[12] during the period between the delivery of the check after 2 P. M. Friday, December 30, and midnight of December 31, 1949.

■ In order to subject Mrs. Kamm's share of the above-mentioned check to her, or her agent's, control during the year 1949, the agent would have had to either carry approximately a quarter million dollars in cash on the streets of New York City during the afternoon of the last business day of the year or he would have had to set up a bank account in her name in a New York City bank. The hearing judge concludes that the federal income tax cases do not support a holding that a jury could find, beyond a reasonable doubt, that any part of this

9. The United States Supreme Court had recognized, prior to the adoption of this regulation: "But taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." See Corliss v. Bowers, 1930, 281 U.S. 376, 378, 50 S. Ct. 336, 74 L.Ed. 916; cf. Ross v. Commissioner, 1 Cir., 1948, 169 F.2d 483, 490-492, 7 A.L.R.2d 719; Commissioner of Internal Revenue v. Douglass' Estate, 3 Cir., 1944, 143 F.2d 961, 963.

10. Neither the joint contract of agency of August 1949 nor the agreement of sale of August 1949 could be altered by Mrs. Kamm without the approval of Mr. Cronheim. The relatively narrow construction of the authority, based on inference, of an agent for two or more principals is exemplified by Restatement of Agency, §§ 20(f) and 41(1). It is noted that the

principals were independent and unrelated.

11. These conditions were: (a) that the bank be "satisfied as to the genuineness of the check," (b) that the bank be satisfied as to the genuineness of "the endorsement thereon," and (c) that the bank have "checked with the maker thereof."

12. See last sentence of § 42-2 of the Regulations quoted above. Kahler v. Commissioner, 1952, 18 T.C. 31, is distinguishable both because the check was made to one payee and because the check for $4,332.97 could be used without further investigation being made by the drawee-bank or the person asked to cash it. There is a significant difference between the ability to cash a check for $5,000. and one for over a quarter of a million dollars.

check constituted income to Mrs. Kamm in 1949 under the situation now before the court.[13]

In Lavery v. Commissioner, 7 Cir., 1946, 158 F.2d 859, 860, the court held that a check in the amount of $2,666.67, received on the next-to-the-last business day of the year, was taxable in that year, but pointed out:

"There might perhaps be a distinction between the date of receipt of cash and the date of the receipt of a check which arrived the last day of the year and too late to be cashed by the payee on that day. In the instant case the taxpayer could have cashed the check on the day it was received by him, or at least on the next day."

In Commissioner v. Fox, 3 Cir., 1954, 218 F.2d 347, the court held that dividends mailed on the last day of the year were not taxable in that year, even though the payees could have received and cashed their checks on that date by calling at the financial institution mailing the checks. At page 350 of 218 F.2d, the court used the following language, which is equally applicable to the facts of this case:

"In the instant case the savings and loan associations adopted the usual corporate practice. There was no attempt on the part of the taxpayer, as in the Kunze case [Kunze v. Commissioner of Internal Revenue, 19 T.C. 29, affirmed per curiam, 2 Cir., 203 F.2d 957] to delay or fix the time of payment to him. The payments in the instant case were made or occurred in the ordinary course of business."

In this case, the agent had the obligation to either cash or deposit the check so that he could pay the $39,630 in insurance and brokers' commissions and divide the balance between his principals. Neither principal could have demanded that he do this in any particular way without the approval of the other principal, since he was entitled to rely on his contract of August 17, 1949, as amplified by the December 1949 oral instructions. The lawyer operating as agent for two independent principals acted in accordance with recognized rules governing fiduciaries[14] and members of his profession[15] in depositing this check in his "attorney" or "trustee" account and drawing checks on this account to those entitled to the proceeds, including Mrs. Kamm. No device was used to delay receipt of this income by Mrs. Kamm.[16] The terms under which this agent received the proceeds allocable to his two principals, requiring him to pay certain expenses and divide the proceeds, are similar to the terms governing escrow agents, whose receipts constituting capital gains for such principals have not been held taxable to such principals until distributed. See Commissioner v. Tyler, 3 Cir., 1934, 72 F.2d

13. This conclusion does not mean that the taxpayer would necessarily sustain, on this record, his burden in the civil tax case of overcoming the presumptive validity of a finding by the Commissioner that this check was a 1949 item.

14. The Restatement of Agency (comment e, § 72) provides:
"If authorized to remit, it is ordinarily inferred that the agent is to remit within a reasonable time and by the means ordinarily used for the transmission of funds * * *. One collecting for a number of principals is normally authorized to mix their funds in one bank deposit, if he indicates that the deposits are made by him as a fiduciary."

15. Canon 11 of the Canons of Professional Ethics of the American Bar Association contains this language:
"Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him."

16. The procedure followed by the agent was most normal in view of the obligation of his principals to pay commissions of $12,100. each to two separate brokers, as well as insurance commissions (see letters attached to Affidavit of Milton M. Unger, Esq., dated 2/24/58).

950,[17] 2 Mertens, "Law of Federal Income Taxation," Rev.Ed., § 10.05.[18]

For the foregoing reasons, the motion to dismiss the indictment will be granted[19] and there is no need to consider the other undisposed of pre-trial motions filed by the defendant.

17. In this case, the court said at page 952:
"They could neither demand their share nor control its disposition prior to that date."
(See, also, opinion in this case at 1933, 28 B.T.A. 367, 370–371.)

18. Cases cited by the Government (p. 8 of letter of 2/6/58) relating to closed transactions are not applicable. Not only do they all involve real estate sales (whereas this was a sale of stock), but all the taxpayers, with one exception (Commissioner v. Moir, 7 Cir., 1930, 45 F.2d 356), were on the accrual basis.

19. The hearing judge appreciates that this is a close question of law in which the Government's determination that this was a 1949 transaction is most understandable, in view of its lack of means of knowledge, at the time of indictment, of all the circumstances surrounding the agent's authority and the terms under which the check was received. However, the hearing judge has concluded, after detailed consideration of the lengthy record, including 54 exhibits to the Bill of Particulars, that the undisputed facts are such that no jury could find, beyond a reasonable doubt, that Mrs. Kamm received her share of the proceeds of the sale in 1949 for purposes of the federal income tax law.