Estate of Louis Kamm, Deceased, and Emily E. Kamm, Surviving Wife, a/k/a Edythe Emily Kamm v. Commissioner. * Edythe Emily Kamm, Transferee of the Estate of Louis Kamm, Deceased, Transferor v. Commissioner. Estate of Louis Kamm, Edythe Emily Kamm, Administratrix Pendente Lite v. Commissioner. Estate of Kamm v. Commissioner
Docket Nos. 69456, 89860, 89861.
United States Tax Court
T.C. Memo 1963-344; 1963 Tax Ct. Memo LEXIS 344; 22 T.C.M. (CCH) 1805; T.C.M. (RIA) 63344; December 31, 1963
*344 H. Kamens, Newark, N.J., and E. J. Goodrich, for petitioner. W. F. Fallon, for respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in income tax for the Estate of Louis Kamm, Deceased, and Emily E. Kamm for the year 1949, of $34,827.22. Respondent determined a deficiency in estate tax of $17,851.19 and a delinquency penalty of $4,462.80 under the provisions of section 3612(d)(1) of the Internal Revenue Code of 1939, against the Estate of Louis Kamm. Respondent also determined that Edythe Emily Kamm is liable, as transferee of the property of the Estate of Louis Kamm, for the estate tax and the delinquency penalty under section 3612(d)(1). The issue for decision in Docket No. 69456 is whether the gain realized on the sale of corporate stock is includable in petitioners' taxable income for the year 1949, and, if so, the amount of such gain. The issues for decision in Docket Nos. 89860 and 89861 are whether (1) the $143,258.82 proceeds from the sale of corporate stock of Retail Realties or any portion thereof are includable in the Estate of Louis Kamm, (2) the Estate of Louis Kamm is liable for a delinquency penalty under the *345 provisions of section 3612(d)(1) for failure to file an estate tax return, (3) the estate is entitled to a marital deduction and (4) Edythe Emily Kamm is liable as a transferee for the estate tax liability due from the Estate of Louis Kamm. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners in Docket No. 69456 are the estate of Louis Kamm, deceased, and Emily E. Kamm, surviving wife, a/k/a Edythe Emily Kamm. Louis Kamm, now deceased (hereinafter sometimes referred to as decedent), and Emily E. Kamm (hereinafter sometimes referred to as Emily) were husband and wife. They filed a joint Federal income tax return for the taxable year 1949 on the cash basis, with the collector of internal revenue at Newark, New Jersey, on June 14, 1950. Louis Kamm, a domiciliary of the State of New Jersey, died intestate on May 3, 1950. Louis (deceased May 3, 1950) and Emily E. Kamm filed a joint Federal income tax return for the calendar year 1950 on June 15, 1951. No estate tax return has been filed on behalf of the estate of Louis Kamm. Prior to his death decedent was engaged in business as a real estate broker. He was also the sole stockholder of *346 a real estate brokerage company known as Louis Kamm Company. Decedent was survived by his wife, Emily, and a daughter Dorothea K. Gould. On November 6, 1946, a corporation known as Retail Realties was organized under the laws of the State of New Jersey, by decedent and David Cronheim, to engage in the real estate business. Although no capital contribution was made, ten shares of capital stock were issued. Five shares were placed in the names of David Cronheim and his nominees, and decedent caused the remaining five shares to be placed in Emily's name. On January 14, 1947, Retail Realties acquired commercial property located in Newark, New Jersey. The consideration for the property acquired by Retail Realties was $1,148,046.60. The funds for the purchase of this property and for closing costs were all borrowed by Retail Realties. The amount of $1,000,000 was borrowed from Connecticut Mutual Life Insurance Company and the loan was secured by a mortgage on the property. This loan was repayable at $50,000 annually in quarterly payments until January 15, 1965, when the balance was payable. Interest on the loan was at the rate of 4 percent annually on the unpaid balance to be paid in *347 quarterly payments. The amount of $150,000 was borrowed by Retail Realties from David Cronheim. This loan was repayable at $10,000 annually in quarterly installments until January 16, 1957, when the entire unpaid balance became due and bore interest at 5 percent per annum on the unpaid balance, payable quarterly. The property was acquired by Retail Realties subject to a lease by Hearns Department Stores, Inc., which had been entered into on July 14, 1943, and extended to December 31, 1949, at an annual rental of $72,000. For each of its fiscal years ended November 30, 1947, 1948, and 1949, Retail Realties reported a deficit on its Federal income tax return after allowance of a deduction for depreciation on its property. On August 18, 1949, David Cronheim (hereinafter referred to as Cronheim), on behalf of the owners of the Retail Realties stock, entered into an agreement to sell all the outstanding shares to Walter Kirschner for $321,398.57. Decedent was instrumental in effecting the sale agreement through his real estate brokerage firm, Louis Kamm Company. The agreement provided that Cronheim, at the closing, was to deliver to the purchaser all ten shares of Retail Realties outstanding *348 capital stock endorsed in blank. On August 18, 1949, the individuals in whose names the capital stock of Retail Realties was held executed an agreement which stated in part as follows: WHEREAS, the undersigned are the holders of the following certificates of capital stock of Retail Realties, a corporation of the State of New Jersey: * * *
which said certificates constitute all the issued and outstanding shares of stock of Retail Realties, and whereas David Cronheim is about to execute an agreement with Walter Kirschner for the sale of all of said shares of stock, and whereas, we the undersigned holders of said shares are familiar with and approve said agreement; NOW THEREFORE, in order to enable the said David Cronheim to carry out and consummate said agreement, we have respectively assigned and endorsed said certificates of shares in blank and delivered the same to Milton M. Unger who is authorized and empowered to deliver the same to the purchaser of said shares of stock, in accordance with said agreement, and to receive payment of the monies due and to grow due under said agreement, and upon receiving such monies, he is authorized and empowered to pay one-half of the same *349 to David Cronheim and the remaining one-half to Emily Kamm, free and discharged of all claims on our part. Dated: August 18, 1949 (signed) Helen B. Jacobus, HELEN B. JACOBUS (signed) Ruth Sampson, RUTH SAMPSON (signed) David Cronheim, DAVID CRONHEIM (signed) Emily Kamm, EMILY KAMM Upon the execution of the sale agreement on August 18, 1949, Cronheim received $75,000 from the purchaser. The agreement provided that if the purchaser failed to carry out the terms of the agreement, the sellers were to retain the $75,000 payment as liquidated damages. The balance of the purchase price, $246,398.57 was to be paid in cash or certified check upon the transfer of the shares and the consummation of the agreement. Cronheim retained one-half of the aforementioned $75,000 payment and issued a check for the balance, in the amount of $37,500, payable to Emily Kamm. This check was deposited on August 19, 1949, in the Franklin Washington Trust Company Bank, Newark, New Jersey, in an account standing in Emily's name. The sale agreement scheduled the closing date for January 3, 1950. However, the purchaser was given the option of advancing the settlement date by giving 3 days' written notice. *350 The purchaser did accelerate the closing date to December 30, 1949. In order to consummate the sale agreement all the stock certificates, endorsed in blank, were delivered to Milton M. Unger, an attorney practicing in Newark, New Jersey. With respect to the sale of the Retail Realties corporate stock, Unger had a conference with Cronheim on December 23, 1949, at which time he was given instructions relating to the closing of the sale. Unger was instructed that upon receiving the purchase price, he was to disburse $15,430 to David Cronheim Agency for insurance premiums, $12,100 each to David Cronheim Agency, Louis Kamm Company, and Albert M. Greenfield Company as sale commissions; and then divide the balance in two equal shares and remit checks to Cronheim and Emily Kamm. Decedent confirmed these instructions to Unger during a telephone conversation. Decedent delivered the stock standing in Emily's name to Unger sometime between August 18, 1949, and mid-December of that year. About December 15, 1949, decedent and Emily went to Florida where they remained until after January 3, 1950. On December 30, 1949 (the day of the closing), Unger was directed by decedent during a telephone *351 conversation from Florida to deposit $70,000 of the sale proceeds in Emily's "special" account with the Franklin Washington Trust Company, and deposit the balance in her checking account. On December 30, 1949, a Friday, Unger attended the closing which was held in the offices of the purchaser's attorneys in New York City. The closing was concluded between 2 p.m. and 3 p.m. on that day. At the closing Unger delivered all the Retail Realties' corporate stock to the purchaser in return for payment of the balance due of $246,398.57. This amount was paid by way of a certified check made payable to Unger drawn on a New York City bank. Immediately after the closing, Unger returned to Newark, New Jersey. He arrived in Newark after 3 o'clock, the closing hour of the Franklin Washington Trust Company but gained admittance to the bank and deposited the $246,398.57 certified check in his trustee account. On the next day, Saturday, December 31, 1949, Unger prepared two checks drawn on his trustee account in the amounts of $70,000 and $32,443.09 payable to Emily Kamm. These checks were deposited in two separate bank accounts standing in Emily's name in the Franklin Washington Trust Company on *352 January 3, 1950, which was the first business day after December 30, 1949. In addition to the proceeds of $139,943.09 ($37,500 on execution of agreement and $102,443.09 on closing) received on the sale of the Retail Realties capital stock and deposited in bank accounts in Emily's name, the further sum of $3,315.73, representing one-half of the cash account of that corporation at the time of sale, was also received. As of November 6, 1946, when decedent and Cronheim organized Retail Realties, decedent had judgments outstanding against him totaling at least $45,831.63. Some of these judgments had been outstanding against decedent for 10 years or more. Also, just prior to forming Retail Realties, decedent had compromised two other judgments against him in the amounts of $100,841.11 and $4,676.58 by making payments totaling $1,450. In two instances where decedent compromised judgments totaling $105,508.03 (one being the aforementioned judgment of $100,841.11), decedent kept the judgments open of record by having them assigned to his daughter, who then assigned them to his wife. These assignments were never recorded. Neither decedent's daughter nor Emily paid anything for the assignments. *353 Emily during her marriage with decedent had separate property of her own worth approximately $105,000. From time to time she advanced sums of money to decedent. By an indenture dated January 18, 1943, decedent acknowledged that on and before March 14, 1939, he was indebted to Emily in the amount of $40,000 and that he had assigned to Emily stock of Kamm & Kamm, Inc., a New Jersey corporation, as collateral security for the loan. At the time the Retail Realties stock was sold, decedent was indebted to Emily in the amount of $40,000. After the proceeds of sale of the Retail Realties stock were deposited in her accounts, Emily withdrew therefrom a part of these proceeds at the request of and for the use of decedent. Gain from the sale of the Retail Realties stock was not reported on petitioners' income tax return for either 1949 or 1950. On April 14, 1954, March 3, 1955, and April 13, 1956, Emily executed waivers, Form 872, extending the statute of limitations for assessment of income tax for the year 1950, to June 30, 1955, 1956, and 1957, respectively. Milton Unger was indicted under 26 U.S.C.A. 3793(b)(1), the indictment charging that defendant *354 Unger did wilfully aid and assist in the preparation of a false and fraudulent joint income tax return for the calendar year 1949 of decedent and Emily Kamm in that Unger knowing that in the year 1949 he had received $143,258.82 as proceeds on the sale of stock of Retail Realties, Inc., on behalf of Emily, prepared and caused the said joint income tax return to be prepared without reporting therein either the sale or the long-term taxable gain thereon. The United States District Court, District of New Jersey, in an opinion reported under the caption of United States v. Unger, at 159 F. Supp. 850 (1958) dismissed the indictment on defendant's motion. A Form 872 dated January 10, 1955, purportedly extending to June 30, 1956, the period for assessment of income tax of the estate and Emily for the taxable year 1949 was executed by Emily. Another Form 872, dated April 13, 1956, was executed by Emily purportedly extending the period to assess income tax of the estate and Emily for the taxable year 1949 to June 30, 1957. The Forms 872 were signed by Emily both individually and in a representative capacity with the further statement as follows: Edythe Emily *355 Kamm - Surviving Spouse Who warrants and represents that she is authorized to execute this consent on behalf of the estate as personal representative and person who is legally entitled to be appointed administratrix of her husband's estate and is in fact acting as such although no letters of administration have been issued to anyone. The gross income reported on the joint Federal income tax return for 1949 filed by decedent and Emily was $20,789.50. Respondent issued a notice of deficiency for the year 1949 to petitioners June 26, 1957, stating in part as follows: (a) It has been determined that Emily E. Kamm failed to report a taxable gain realized from the sale of a capital asset, to be taken into account in the amount of $71,629.41, computed as follows: Net sales price of stock of
Retail Realties, Inc.
$143,258.82
Long-term capital gain
143,258.82
50% to be taken into
account
$ 71,629.41
In his notice of deficiency to the estate of Louis Kamm respondent determined that the total gross estate was $191,384.78, consisting of insurance of $29,228.47, other miscellaneous property of $18,897.49, and "mortgages, notes cash and/or * * * transfers during decedents [decedents] *356 life" of $143,258.82. Respondent in his notice deficiency to Emily as transferee determined that property of the decedent was transferred to her or received by her during decedent's lifetime and as heir of decedent. Opinion The first issue in these cases centers about the creation in 1946 of a corporation, Retail Realties, Inc., by decedent and David Cronheim, with one-half of the capital stock placed in Emily's name, and the subsequent sale of the Retail Realties stock whereby $143,258.82 was received for the stock held in Emily's name. Respondent's primary contention is that the sale of the stock was consummated and the income therefrom was received in 1949, thus making the gain on the sale taxable to petitioners in the year 1949. Respondent's position is that decedent owned the stock at the time of its sale and that since decedent paid nothing for the stock it had a zero basis to him. In the alternative respondent contends that if the stock were owned by Emily at the time it was sold, the basis for the stock was likewise zero. It is respondent's position that the income omitted by petitioners from their 1949 income tax return exceeded 25 percent of the gross income reported *357 thereon, and therefore, the 5-year statute of limitations of section 275(c) of the Internal Revenue Code of 1939 is applicable. Petitioners take the position that the income from the sale of the stock was taxable in 1950, not 1949. They contend that the stock belonged to Emily and that she did not receive the sales proceeds until 1950. Petitioners contend that in any event, the decision in United States v. Unger, 159 F. Supp. 850 (D.N.J. 1958), is res judicata as to the year of taxability being 1950 and that in determining the amount of the gain on the sale of the stock, Emily is entitled to a basis of $40,000 which petitioners assert represents the amount of indebtedness owed by decedent to Emily which was cancelled on her receipt of the stock. Since respondent is invoking the 5-year statute of limitations provided in section 275(c) of the Internal Revenue Code of 1939 for the year 1949, he has the burden of proving an omission from gross income of an amount in excess of 25 percent of the gross income reported on the return. C. A. Reis, 1 T.C. 9 (1942). In our opinion respondent has carried this burden by showing *358 that the entire gain on the sale of the stock was taxable to petitioners in 1949. The basic facts are not in dispute. Unger received a certified check on behalf of the selling shareholders from the buyer in the year 1949. The check was honored in due course by the drawee bank. Payment by check constitutes income either actual or constructive on the receipt of the check. Urban A. Lavery, 5 T.C. 1283 (1945), affd. 158 F.2d 589 (C.A. 7, 1946), and Charles F. Kahler, 18 T.C. 31 (1952). Cf. Estate of Modie J. Spiegel, 12 T.C. 524 (1949) and cases cited therein. It does not matter that the check is received after banking hours on the last day of the year. Charles F. Kahler, supra.
The record further shows that Unger was acting as agent for the sellers. The rule is that receipt of income by an agent is receipt by the principal. F. H. Wilson, 12 B.T.A. 403 (1928); Minnie R. Ebner, 26 T.C. 962 (1956); and O. D. Bratton, 31 T.C. 891 (1959), *359 affd. 283 F.2d 257 (C.A. 6, 1960), certiorari denied 361 U.S. 911. Therefore, the receipt of a check by Unger was income on receipt in 1949, and because Unger was agent for the sellers, the income was taxable to the sellers as principals in 1949. Petitioners argue that Unger was acting as a lawyer and therefore was not an agent of the type covered by the rules in the cases dealing with receipt of payments by agents. A lawyer can, of course, act as an agent if that is in fact his capacity in the transaction. Minnie R. Ebner, supra.Petitioners further contend that Unger acted in the nature of an escrowee, representing more than one party to the transaction, and, therefore, the rule of receipt by an agent is receipt by a principal is not applicable, citing Sidney F. Tyler, et al., Trustees, 28 B.T.A. 367 (1933), affd. 72 F.2d 950 (C.A. 3, 1934). In the Tyler case the contract of sale entered into by buyer and seller, provided for a bank to act as repository where the buyer would place the purchase price and the selling shareholders *360 would place their stock. The sales agreement stipulated that if 80 percent of the capital stock were not deposited for sale, the bank would return the stock to the sellers and the purchase price to the buyer, and if the sale was consummated the stock would be delivered to the buyer and the purchase price less certain expenses would be remitted to the sellers "shortly after January 1, 1928." The Court held that the selling shareholders did not have income on the sale until the sale proceeds were actually paid to them by the bank. The function of the bank in the Tyler case was created by agreement of both buyer and seller and the bank represented the interests of both. Unger, on the other hand, was the agent of the sellers. He was authorized by the shareholders to deliver their stock to the buyer, to receive payment therefor, and remit the proceeds equally to Cronheim and Emily. Unger received subsequent oral directives from Cronheim and decedent to pay certain expenses before remitting to Cronheim and Emily. However, it is clear that Unger did not in any way represent or act on behalf of the buyers. Unger acted as an agent only for the selling shareholders. In a number of cases *361 involving receipt by an agent, the agent was acting for more than one person, representing one side of the transaction involved. Minnie R. Ebner, supra, and O. D. Bratton, supra. Petitioner seeks to distinguish the Ebner case on the ground that in Ebner the check given by the purchaser to the agent for the sellers was deposited in the agent's special account and was cleared and paid by the bank on which it was drawn before the end of the pertinent tax year, whereas in the present case the certified check given Unger had not been cleared by the drawee bank before the end of the year 1949. We do not consider the clearing of the check given the agent to be a determinative feature in the holding in the Ebner case that the receipt of income by the agent was receipt by the principals. Such a requirement would be contrary to the holding in the Kahler case, which, as we have said, is that the receipt of a check paid in due course constitutes income on receipt. Petitioners contend that the proper year of taxability has already been decided, adversely to the respondent, in the case of United States v. Unger, 159 F. Supp. 850 (D.C.N.J. 1958), *362 and that that case is res judicata in the present case. In that case the aforementioned Milton Unger was indicted under section 3793(b)(1) of the Internal Revenue Code of 1939 for assisting in the preparation of a false and fraudulent return of decedent and Emily for the year 1949. The indictment charged that the 1949 income tax return was false because the proceeds of sale of the Retail Realties stock were omitted therefrom. The District Court dismissed the indictment on the ground that under the circumstance shown by the pleadings a jury could not find beyond a reasonable doubt that the check given Unger constituted income to decedent and Emily in 1949. An acquittal in a criminal case charging a taxpayer with fraudulent evasion of income tax is not res judicata in a civil case involving an addition to tax for fraud for the same taxpayer for the same taxable year. Helvering v. Mitchell, 303 U.S. 391, 82 L. Ed. 917, 58 S. Ct. 630 (1938). [1] In a criminal case every element of the offense must be proven beyond a reasonable doubt. Holland v. United States, 348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127 (1954). A necessary requirement in the criminal prosecution of Unger *363 was proving the 1949 income tax return to be false. The difference in the degrees of proof required was recognized by the District Court in the Unger case when it stated at page 854: The hearing judge concludes that the federal income tax cases do not support a holding that a jury could find, beyond a reasonable doubt, that any part of this check [check received by Unger from purchaser] constituted income to Mrs. Kamm in 1949 under the situation now before the court. [13]
Even though the Commissioner does not have the presumption of correctness in this case until he has proved an omission of income in excess of 25 percent of reported gross income so as to make applicable the 5-year statute of limitations, he can still carry his burden of proof *364 herein by a preponderance of the evidence and is not required to show proof beyond a reasonable doubt, as in a criminal case. Cf. Mitchell v. Helvering, supra. Petitioners argue that in any event they are entitled to a $40,000 basis for the stock. This argument is based on their assertion that the stock was given to Emily in cancellation of a $40,000 indebtedness owed to Emily by decedent. On the basis of the evidence as discussed hereinafter in the estate tax cases, we hold that decedent never completed delivery of the stock to Emily, and therefore, the stock was decedent's at the time it was sold. Furthermore the preponderance of the evidence establishes that even if the stock were given by decedent to Emily when he had it issued in her name, the stock had no fair market value at its date of issue and therefore would not take the $40,000 basis of the indebtedness in any event. No amount was paid in for the stock and the entire purchase price of the real property was borrowed by Retail Realties. There was clearly no book value to the stock at the time it was issued. The purchase of the property appears to have been in an arms'-length transaction so that the preponderance of *365 the evidence here shows there to have been no fair market value to the stock at the time it was issued in Emily's name. Under these circumstances, whether the stock was decedent's or Emily's when it was sold, its basis was zero. For this reason the $37,500 received by Emily unquestionably was capital gain income when the sale was closed on December 30, 1949. Of this amount, the 50 percent taxable income is in excess of 25 percent of petitioners' reported reported income. [2] This showing is sufficient to sustain respondent's burden and place on petitioners the burden of showing error in the inclusion in petitioners' income of their portion of the check received on December 30, 1949. While we do not consider petitioners' argument that in order to constitute income in 1949 it is necessary that it be possible for petitioners' portion of the certified check received by Unger on December 30, 1949, to be reduced to cash or in some other way segregated from the other funds, to be legally sound, even if such a requirement did exist, petitioners have failed to show that such a segregation was not possible. There is no showing that ample time did not remain after the closing on December 30, *366 1949, for Unger to go to the issuing bank in New York, cash the certified check and deposit to the account or buy cashier's checks for each recipient of a distribution from the certified check. Petitioners asserted in an amendment to their petition that Emily did not have authority to act on behalf of the Estate of Louis Kamm in executing the forms 872 which purported to extend the period for assessment of income taxes for the year 1949. Whether Emily had the authority to execute the forms 872 on behalf of the Estate is a moot question because Emily, individually, as a signer of decedent's and her own 1949 joint income tax return, is liable for the *367 whole deficiency arising therefrom under section 51(b)(1) of the Internal Revenue Code of 1939. There is no question that Emily had authority to extend the period for assessment of income tax liability as to herself when she signed the forms 872 in her individual capacity, as well as signing on behalf of the estate. In view of this, the entire tax liability for 1949 can be assessed against her individually notwithstanding the fact that the statute of limitations may have expired as to the estate. We sustain respondent in his determination of petitioners' taxable income for the year 1949. [3]
*368 Respondent in his notice of deficiency determined that the $143,258.82 sale proceeds were includable in decedent's gross estate for estate tax purposes. On brief respondent contends that the $143,258.82 sale proceeds are includable in the gross estate on the theory either that decedent actually possessed such proceeds at his death or that he had made a gift to Emily, either of the stock or of the proceeds from the sale thereof, and that such gift is includable in the estate as a gift in contemplation of death. Petitioner, on the other hand, contends that decedent effected a transfer of the stock in 1946 when he caused the stock to be issued in Emily's name, and that thereafter the stock and the proceeds from the sale thereof belonged to Emily. The evidence in the record as to the ownership of the Retail Realties stock is incomplete. It is stipulated that decedent caused the stock to be issued in Emily's name. The record shows that after the stock was placed in Emily's name, decedent continued to be instrumental in the activities of the corporation. Decedent's real estate company secured the buyer who purchased the stock in 1949, and decedent gave instructions respecting the stock *369 sale, i.e., that Unger was to pay certain expenses from the sale proceeds and place the balance in bank accounts standing in Emily's name. Emily, on the other hand, is not shown to have taken any part in the affairs of the corporation. There is no evidence that decedent ever relinquished possession of the stock certificates. Unger's testimony that he received the stock held in Emily's name from decedent confirms the conclusion that decedent retained possession of the stock. Furthermore, Emily's testimony at the hearing, although we appreciate that she might not have completely understood some of the questions, tends to confirm the conclusion that decedent retained possession of the stock certificates until the sale. The only dominion Emily ever exercised over the stock certificates was that at some unspecified time before the sale was completed she endorsed the stock certificates in blank. For all the record shows these stock certificates may have been endorsed in blank by Emily at the time they were issued in her name without her ever knowing what she signed and remained in decedent's possession so endorsed until he delivered them to Unger. Emily testified that she did not *370 recall endorsing the stock and that oftentimes she signed papers given to her by her husband without reading or understanding the document being signed. Our conclusion is that decedent retained possession of the stock up until the time of the sale. Under New Jersey law the placing of stock in the name of another on the books of the corporation does not constitute a constructive delivery so as to effect a transfer. In New Jersey the stock certificates themselves must be delivered to the intended recipient in order to effect a transfer. Besson v. Stevens, 94 N.J. Eq. 549, 120 A. 640 (1923). Also, there is no showing that decedent ever constituted himself a trustee holding the stock certificates on behalf of Emily. Although decedent did not transfer the stock to Emily, he did deliver to her the proceeds from the sale of the stock when, in 1949 and 1950, such proceeds were deposited in bank accounts standing in Emily's name. Upon deposit, Emily acquired control over the funds, thus making a completed transfer at that time. The testimony was that thereafter decedent was able to use such funds only upon requesting such funds from Emily. *371 The transfer of the proceeds from the sale of the stock was made within 3 years of decedent's death, and, therefore, according to the provisions of section 811(1) of the Internal Revenue Code of 1939, the transfer is presumed to have been made in contemplation of death. In the Estate of Louis Kamm respondent determined that the $143,258.82 proceeds were includable in the gross estate either as property held at his death or as transfers during his life. In the transferee case he determined that the transfer was during the lifetime of decedent and as heir of decedent. The argument on brief that the sale proceeds were the subject of a gift in contemplation of death is consistent with respondent's determination of deficiency. The evidence shows that in January 1950, when most of the sale proceeds were deposited in Emily's bank accounts, decedent was in Florida, presumably for reasons of health and that he died 5 months thereafter. There is no other evidence in the record to show that the transfer by decedent was not in contemplation of death. There was consideration received by decedent for the transfer of the sale proceeds to the extent of $40,000. and, thus, to this extent the transfer *372 does not fall within the provisions of section 811(1) of the Internal Revenue Code of 1939. Petitioners contend that the stock was originally put in Emily's name in payment for a $40,000 indebtedness owed to Emily by decedent. Emily testified that she had property of her own worth approximately $105,000 and that she, from time to time, advanced amounts to decedent in the form of loans. Emily estimated that she loaned decedent at least $85,000. The record does not show that decedent had ever made any repayment up until the time Retail Realties was incorporated. Emily testified that she expected to be repaid, and the record shows that in 1943 decedent acknowledged an indebtedness to Emily of $40,000. and that decedent had pledged stock in another of decedent's corporate enterprises to secure this indebtedness. Emily's testimony as to any payment of the $40,000 indebtedness to her is not too clear. However, she apparently did understand that the transaction involving the Retail Realties stock was intended to be partly in repayment of the $40,000 acknowledged indebtedness of decedent to her. We conclude from the evidence that the payment of the sale proceeds to Emily by decedent in 1949 *373 and 1950 was in satisfaction of the acknowledged indebtedness to Emily of $40,000. Therefore, to the extent of $40,000 there was consideration received by decedent for the transfer to Emily. In the determination of deficiency respondent did not give the estate credit for the marital deduction provided for in section 812(e) of the Internal Revenue Code of 1939. On brief respondent concedes the estate is entitled to a marital deduction. The proper amount of the marital deduction can be worked out by a Rule 50 computation. Certainly, the estate qualifies for a marital deduction, subject to the 50 percent limitation of section 812(e)(1)(II), for the one-third interest Emily was entitled to under New Jersey law as her intestate share in the personal property of her husband's estate, see section 3A:4-2, New Jersey Statutes, as well as for the sale proceeds which decedent gave Emily and which we hold are includable in the taxable estate in the amount of $103,258.82. Petitioners contend that the failure to file an estate tax return was due to reasonable cause. However, the penalty provisions of section 3612(d)(1) of the Internal Revenue Code of 1939 require the penalty without exception *374 where no return is filed. It is only when a return is filed late that the question of reasonable cause arises. Chas. F. Roeser, 2 T.C. 298 (1943). On brief petitioners contend that the estate had debts in excess of those allowed by respondent. One of these was a $13,000 debt which, Emily testified, was owed by decedent to Cronheim and which she paid to Cronheim shortly after decedent's death. Petitioners raised no issue respecting additional debts of the estate, either by their pleadings or at the trial, nor have they requested or received permission to amend their pleadings. An issue raised only on brief is not properly before the Court and will not be considered. Samuel J. Rissman, 6 T.C. 1105 (1946). Petitioners contend that respondent's determination of deficiency against the estate is not timely. Since no estate tax return was filed, under the provisions of section 874(b) of the Internal Revenue Code of 1939, the tax may be assessed, or a proceeding in court for the collection of such tax may be started, without assessment, at any time. Respondent has carried his burden of proof in showing Emily to be a transferee. *375 It is conceded that Emily received the $143,258.82 sale proceeds from decedent. We have held that to the extent of $103,258.82 the sales proceeds are includable in decedent's estate as a gift in contemplation of death. Therefore, to the extent of $103,258.82 at least Emily is a transferee of the estate within the meaning of section 827(b) of the Internal Revenue Code of 1939, and because the estate tax liability has not been paid, she is liable for such tax and penalty. Equitable Trust Co., 13 T.C. 731 (1949). Decisions will be entered under Rule 50. Footnotes
*. This case was not consolidated with Edythe Emily Kamm, Transferee of the Estate of Louis Kamm, Deceased, Transferor, Docket No. 89860 and Estate of Louis Kamm, Edythe Emily Kamm. Administratrix Pendente Lite, Docket No. 89861, but by agreement of the parties the latter two cases were to be decided on the record made in the first. For the purpose of avoiding repetition of findings of fact, the cases are being consolidated for findings of fact and opinion.↩
1. In the instant case respondent argues that in any event the doctrine of res judicata is inapplicable because of lack of identity of parties. We consider it unnecessary to discuss this point.↩
13. This conclusion does not mean that the taxpayer would necessarily sustain, on this record, his burden in the civil tax case of overcoming the presumptive validity of a finding by the commissioner that this check was a 1949 item.↩
2. Under such cases as The Dill Company, 33 T.C. 196 (1959), affd. 294 F.2d 291↩ (C.A. 3, 1961), the $37,500 might not be considered income to petitioners until the sale was completed since until that time it might have constituted ordinary income if forfeited for nonperformance by the purchaser instead of capital gain. However, in the instant case the evidence is undisputed that the sale was completed on December 30, 1949, thus making the amount capital gain in that year.
3. Respondent points out in his brief that if the amount of the gain on the stock sale were not taxable in 1949. It would be taxable to petitioner in 1950 which year would be open under sections 1311, and 1312(3)(B), I.R.C. 1954 made applicable to determinations made after the ninetleth day from the enactment of the I.R.C. 1954 by sec. 1315, I.R.C. 1954↩. We do not decide this issue since it is not before us. Petitioners make no mention of this contention of respondent's in their reply brief. It is difficult to understand why this case was presented for decision if respondent's contention with respect to the year 1950 is, at it appears on its face to be, a valid one. Petitioners' 1950 return which is in evidence shows only slightly less reported taxable income than their 1949 return.